**Opinion issued May 19, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00121-CR

————————————

**PAUL BRIONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 178th District Court
Harris County, Texas
Trial Court Case No. 1268863

## MEMORANDUM OPINION

A jury found appellant, Paul Briones, guilty of the offense of indecency with

a child[1] and assessed his punishment at confinement for twenty years.[2]  In three

---

[1]    *See* TEX. PENAL CODE ANN. § 21.11(a) (Vernon 2011).

issues, appellant contends that his trial counsel provided him with ineffective assistance during both the guilt and punishment phases of trial.

We affirm.

## Background

The complainant testified that during the summers of 2004, 2005, and 2006, she and her older sister spent many weekends visiting the home of appellant, their uncle; Joanna Briones, their aunt; and their three cousins. Appellant was then a law enforcement officer who worked often and was "never home." One night, during a weekend visit in 2004, when the complainant was ten years old, she, her sister, and one of her cousins watched a movie while lying on the living room floor. Joanna instructed the three girls to be asleep by the time appellant came home from work. Although the complainant's sister and cousin fell asleep, the complainant stayed awake and continued to watch the movie. However, when she saw the headlights of appellant's truck as it approached the house in the driveway, she pretended to be asleep. The complainant noted that at this time, Joanna was

---

[2] Although another jury previously found appellant guilty of the offenses of aggravated sexual assault of a child and indecency with a child, the trial court granted a new trial because items not admitted into evidence had been erroneously submitted to the jury during its deliberations. *See State v. Briones*, Nos. 1268861, 1268863 (248th Dist. Ct., Harris Cty., Tex., June 30, 2011). Here, in appellant's second trial, although the jury found appellant guilty of the offense of indecency with a child, it acquitted him of the offense of aggravated sexual assault of a child.

2

asleep in her bedroom, but the complainant could not recall whether her other two cousins were in the house.

Appellant came into the house through the back door, walked into the living room, turned off the television, hung up his jacket and belt, and adjusted the blanket that was covering the girls on the living room floor. He then went into the kitchen, and the complainant heard him "taking out jars" from the refrigerator and opening containers. Appellant then walked into his bedroom, which adjoined the living room, and returned to the kitchen.

When appellant emerged from the kitchen, he walked over to where the complainant was lying on the floor in the living room. He removed the blanket that was covering her, got down onto "[h]is hands and knees" on the floor at her feet, "pull[ed] down" her athletic shorts "almost to [her] knees," and then "pull[ed] down her underwear" "the same distance as [her] shorts." Appellant then "place[d] his hand . . . [o]n [her] vagina" and "mov[ed]" his "fingers." The complainant, who was lying on her back, moved, "act[ing] like [she] was waking up." Appellant then pulled up her shorts and underwear, placed the blanket back over her, got up, and went back into the kitchen.

"Maybe less than a minute" later, appellant returned, "remove[d] [the complainant's] shorts and underwear," lowering them down to her knees, and put his "mouth . . . down there," "on [her] vagina," for a "few seconds." She could

3

"feel his moustache and . . . his tongue down there," "moving." The complainant, still pretending to sleep, moved again, "more than [she] had the first time," and turned over to her side. Appellant again pulled up her shorts and underwear, replaced the blanket, and went back into the kitchen.

"[L]ess than a minute later," appellant returned to the complainant a third time. He "pushe[d]" her "back [on]to her back," causing the blanket to fall away. He once again "removed" her shorts and underwear "to [her] knees" and placed "his mouth and his hands" "down there" for "a few seconds." The complainant moved quickly, and appellant again pulled up her shorts and underwear, placed the blanket back over her, and went into his bedroom. At that point, she got up and moved in between her sister and cousin, who were both still asleep. Shortly thereafter, appellant emerged from his bedroom, "stood by the fireplace," and "just stared" at her. He then went into the kitchen, "grabbed his sandwich," and went back into his bedroom.

In the morning, the "minute [her] aunt got up," the complainant told her that she wanted to go home. Joanna then drove the complainant and her sister home. The complainant did not tell anyone about appellant's abuse because she was "scared." And she felt that reporting the matter to law enforcement "just wasn't an option for [her]" because appellant "was a police officer." She continued to stay over at appellant's house that summer, and again during the summers of 2005 and

4

2006, because her sisters were still going over there and she felt a need "to protect them" from appellant. During the summer of 2007, appellant began coming over to the complainant's house to talk with her mother. "The fact that [appellant] was coming over made [her] feel unsafe," so she then told another aunt, Katrina Pena, about the abuse.

Pena, who is a sister-in-law of both Joanna and the complainant's mother, testified that on a Sunday during the summer of 2007, while she was driving the complainant home from church, the complainant asked whether she could tell Pena something without Pena requiring her to tell her parents. The complainant, who was "upset," "began to cry" and said, "My uncle touched me." Pena then told the complainant that she would have to tell her parents about the incident, but she would give the complainant some time to tell them herself. Later, on December 31, 2007, the complainant telephoned Pena and told her that she was ready to tell her parents.

The complainant's mother testified that one day in January 2008, while she was driving the complainant to school, the complainant started crying, stated that she needed to talk with her, and asked her to telephone Pena. They then went to Pena's house, where Pena stated that the complainant had told her "about five or six months ago" that appellant "had touched her." The complainant began nodding and crying, went into one of the bedrooms, and screamed and buried her head into

5

a pillow. The complainant then told her mother how one night, while she was lying on the floor in the living room at the Brioneses' house and everyone else was asleep, appellant came home from work, pulled off her shorts and panties, and "started kissing [her] down there," pointing to her "genital area." When she moved, he stopped and hurriedly pulled up her panties and shorts. Appellant then went into the kitchen and made a sandwich. He came back, "took her panties and her shorts back off," and "kissed and licked her two more times." After hearing the allegations, the complainant's mother telephoned her husband and asked that he come to Pena's house.

The complainant's father testified that after he arrived at the Pena's house, the complainant "shut down" and "didn't want to discuss" the matter. And she later refused to talk with Dr. Dana Hahn, a psychologist, whom he and the complainant's mother had found to help her. The complainant's father explained that they did not immediately report the matter to law enforcement because they wanted to "solely focus" on the complainant at the time, reporting the matter would result in "serious consequences" for the families, and appellant was simply "not [the] priority." However, his family did "sever[] all contact" with the Brioneses. In 2010, while the complainant's father was picking up towels in the complainant's bedroom, he discovered a letter that she had written discussing how the abuse had affected her. The complainant's father and mother, regarding the

6

letter as a "definitive cry for help," became "alarmed" and decided that it was "time to move forward" and "press charges." After they first met with a Houston Police Department ("HPD") officer named "Munoz," they reported the matter to the Harris County Sheriff's Office ("HCSO"). They also took the complainant to see a second psychologist, Dr. Linda Meeds, who treated the complainant for two years thereafter. Also, during this time, a nurse practitioner, Avalea Cook, treated the complainant.

Claudia Mullins, a forensic interviewer at the Harris County Children's Assessment Center (the "CAC"), testified that in 2010, she interviewed the complainant, who "cry[ed] at different times" and "appeared to be like many children who disclose abuse, like they're reliving it with the gestures that they use." The complainant was able to provide a "pretty long" narrative and "sensory details," and her "nonverbal cues" were consistent with her disclosure. Mullins explained that a child's delayed disclosure of sexual abuse is common when the circumstances involve someone whom the child knows and trusts because, generally, such a child does not want to cause trouble and fears the disruption of familial relationships.

During the punishment phase of trial, HCSO Lieutenant M. Miller testified that appellant began working as a HCSO deputy in 1983. In 2007, appellant, who had been assigned to work as a court bailiff, was transferred to the Harris County

7

jail "for disciplinary reasons." In 2009, Miller received a letter from an inmate regarding appellant's behavior toward another inmate, Vielko Castro. As a result of the letter, appellant was re-assigned to an "all male floor." And, on January 10, 2010, during an investigation into the matter involving Castro, appellant resigned from his position with the HCSO.

Castro testified that in 2008, while she was an inmate at the Harris County jail and under the direct command of appellant, he "used to pay more attention to her," would "pull [her] out of the tank" into the hallway, ask her questions about her case, and offer her advice. In 2009, he arranged for her to be moved to the "education tank," even though she was not qualified to participate in the education program. Castro explained that her previous "tank" had "24 beds," but inmates in the "education tank" had "single cells." After her transfer, appellant spent "more and more" time around her. Then, Castro noted, appellant would have her accompany him to the "mat room" and "into a stairwell away from security cameras," where he would kiss her and touch her "breasts" and "vagina." She explained that, during these instances, she was "nervous" that they would get caught because appellant worked the day shift, there were several individuals walking around at that time, and the mat room was a "high traffic area."

Dr. Lawrence Thompson, Jr., Director of Therapy and Psychological Services at the CAC, testified that "some sex offenders" have a "cycle" of abusing

8

people and "getting excited by the possibility of getting caught." He explained that there is "no way to change sexual attraction to children"; "community supervision does not change" it; and "[t]he only way to be certain a sex offender [is] not going to reoffend is to incarcerate them." During cross-examination, Thompson clarified that his explanation was in regard to "pedophiles," and he agreed that "not all people who act out against children are necessarily pedophiles." He noted that the "only way" to diagnose a person as a pedophile is to "talk with" that person "one-on-one." And Thompson stated that he did not know the facts of this case and had never spoken with appellant.

Oralia Schmidt, appellant's sister, testified that he served in the United States Navy for six years and was a deputy sheriff for 33 years. When appellant was sixteen years old, their father was killed, and appellant became the "anchor" of the family. Over the years, he took care of their mother and remained close with his family. Schmidt noted that, as an adult, appellant had been "[v]ery responsible" and had "always worked, always had two jobs." During cross-examination, Schmidt admitted that when appellant was 38 years old and married to Joanna, he met Rebecca Esquivel, who was 21 years old, and they had a child together.

After the trial court entered its judgment, appellant filed a motion for new trial, arguing that his trial counsel, John Floyd, had provided him with ineffective

assistance during the guilt phase of trial because he failed to prepare for trial; "did not prepare a defense"; "failed to call at least six important fact and character witnesses"; and "refused to call the defense's medical expert." Appellant further argued that Floyd had provided him with ineffective assistance during the punishment phase because he "failed to prepare and present mitigation evidence"; the sole witness he called "hurt the defense"; and he "failed to present that appellant served honorably in the Navy, had a large family, work two to three jobs at a time for many years, took care of his elderly mother, and worked in the court system for many years." He asserted that "numerous sheriff deputies, attorneys, friends, and family would have testified concerning [his] distinguished career." Appellant further asserted that Floyd "failed to use transcripts from the prior trial to impeach important state's witnesses."[3] He attached to his new-trial motion his affidavit and the affidavits of Joanna, two of his children, and Abraham Fisch, who had represented appellant during his first trial and on the new-trial motion in the instant case.

At the hearing on appellant's new-trial motion, the trial court admitted into evidence Floyd's notes detailing his work in investigating the facts and preparing for trial. Floyd testified that he is a board-certified criminal-defense attorney with twenty years of experience. He obtained the transcript from appellant's first trial,

---

[3] *See State v. Briones*, Nos. 1268861, 1268863 (248th Dist. Ct., Harris Cty., Tex., June 30, 2011).

10

and he, his co-counsel, a third attorney in his office, his paralegal, and his investigator each read the transcript. The transcript was then analyzed and organized into spreadsheet summaries. Floyd's investigator interviewed the jury foreman from the first trial, appellant, Joanna, appellant's children, Pena, the complainant's sister, and Castro, among others. And Floyd reviewed the recorded interviews and the investigator's reports. He also talked with Joanna and appellant "multiple times," both together and separately. And Floyd, "many, many times," discussed with them both the strategy of not using Joanna as a witness because of negative items contained in the State's file, and they agreed with that strategy. Floyd's notes demonstrate that he considered several defensive theories and presented them to appellant. Further, Floyd and his co-counsel went to the district attorney's office to review the State's file on "multiple occasions" in preparation for trial.

Floyd reviewed the testimony of appellant's children from the first trial, and he noted that because the evidence did not establish a specific date on which the offense had occurred, the children could not affirmatively state whether they were present in their house at the time of the offense. Thus, the benefit of their testimony was "limited" and presented "some conflicts." He ultimately chose not to call Joanna or appellant's children as witnesses during the punishment phase

11

because the State could then "get into family issues and really emphasize those."

Floyd explained,

> We talked to [appellant] about who we should call. And as we were going through everyone and talking about kind of the pros and cons, I did tell [him] that I was planning on just calling one of his family members in, because there was just too much extraneous conduct out there. And so I picked Ms. Schmidt, because after interviewing all of them, she actually knew the least of this conduct. And I felt that if we had to call somebody, . . . she was the one to call.

Floyd also subpoenaed the complainant's medical records from Dr. Hahn, Dr. Meeds, and Nurse Cook. From his discussions with Meeds, he determined that she was "hostile" toward the defense, resided outside the subpoena range of the trial court, and was unwilling to make herself available for trial. Floyd noted that Hahn had nothing to offer because the complainant had refused to speak with her. And he concluded that Cook's testimony would be "more harmful than helpful." Moreover, Floyd explained that although he had hired Dr. Pierce as an expert for the defense, Pierce ultimately agreed with the opinion of the State's expert, Mullin, that the abuse had occurred. Thus, Floyd "didn't need him to get up there [on the witness stand to] corroborate the State's witnesses."

Floyd further testified that although there were inconsistencies in the complainant's testimony between the first and second trials, they, given that the offense had occurred ten years prior, were "minor," and the allegations "remained extremely consistent." And "going through transcript after transcript" to "impeach

12

a victim in front of a jury" and "hammering [her] with []discrepancies that mean[t] nothing" would have been "ineffective," would have "backfire[d]," and would have damaged his credibility with the jury. Rather, he watched for "major inconsistencies." Floyd's strategy "throughout the case," "no matter how it was laid out," was to establish that appellant's commission of the offense "was improbable." And his specific strategy in the punishment phase was to "limit the jury's exposure" to appellant's character issues and bad acts by "not dwelling on them and not giving the State any incentives to continue to dwell on them."

At the close of the new-trial hearing, the trial court made the following oral findings[4]:

> Number one: The Court finds that in light of all the circumstances, . . . attorney John Floyd's acts or omissions cited . . . in the record at this motion for new trial hearing, and in defendant's motion for new trial and brief in support thereof, were not outside the wide range of professional competent assistance.
>
> Two, trial counsel did not abandon his client during trial. The record's replete with his preparation before trial and during trial. State's Exhibit No. 1, items 1 through 3 and 9 through 21, also set out trial counsel's pretrial preparation.
>
> Three, trial counsel did conduct a thorough and independent investigation of the facts and circumstances in this case. He, his co-counsel, his investigators and paralegal, did substantial pretrial investigation in preparation of the defense in this case.
>
> Four, trial counsel sought out and interviewed all potential witnesses, including the grand jury foreman, . . . who sat as foreman of the jury that convicted the defendant of both charges in the June 2011 trial. And from this grand jury foreman, he obtained valuable insight as to

---

[4]     *See* TEX. R. APP. P. 21.8(b).

the efficacy of certain trial tactics and witness credibility. The Court does not find that trial counsel's investigative acts or actions were deficient, in that in addition to interviewing the jury foreman, counsel also interviewed all the relevant potential fact witnesses and character witnesses in the case . . . .

Trial counsel also retained a private investigator who assisted in interviewing witnesses, and had two attorneys, as well as a paralegal work on substantial research and drafting of various motions, objections, analysis of the first trial.

Said investigator . . . conducted numerous interviews of the relevant key witnesses mentioned earlier, including Vielko Castro, the main punishment witness against the defendant, and issued dozens of subpoenas, including one for Officer Munoz, and also took numerous photographs of the alleged crime scene, and has generated substantial investigative reports.

Five, trial counsel prepared defensive theory that the offense did not occur, and did not call certain fact and character witnesses, and defense expert Dr. Pierce, for reasons cited in the record of this motion for new trial hearing, due to trial counsel's trial strategy reasons recited in the record.

The Court finds that such strategic decisions had a plausible basis, as set out in the record. Most notably, Dr. Pierce, while an expert, was potentially a witness who could harm defensive theory, which was that no offense occurred. Where credible evidence is, that Dr. Pierce could have testified that the complainant's drug use, bipolar situation, could be attributable to having actually been sexually abused.

Number six, trial counsel called no defense witnesses at the guilt or innocence phase, and did not call defendant to testify in his own defense, due to counsel's advice and agreement with defendant, that he should elect not to testify.

The Court finds that trial counsel's trial strategy for not calling witnesses or calling defendant, are recited in the record in such strategic decisions had a plausible basis as set out in the record. The Court finds further that neither the defendant nor any other witnesses were ever promised that they would be allowed to testify, and at least two informed trial counsel that it could possibly be less than completely forthcoming.

14

. . . .

Trial counsel also subpoenaed the records of Dr. Meeds, who proved to be a hostile witness, and whose records reflected and included a suicide note, which would be harmful for the defense, and which also included evidence that the complainant may possibly have had some drug issues and/or mental health issues. And as a strategic reason, chose not to call Dr. Meeds, in addition to the fact that she was outside subpoena range and unwilling to make herself available for trial.

In sentencing, trial counsel called only one witness, defendant's sister, [Schmidt], who proved up defendant's eligibility for probation, but also provided mitigation—some mitigation evidence. She also, on cross-examination by the State, provided for the jury some evidence that was detrimental to the defendant's—trial counsel's strategy to call just her, was a calculated decision, strategic decision, based on the plausible basis that he sets out in the record.

Eight, trial counsel made a reasonable decision to forego presentation of further mitigation evidence, only after evaluating available testimony of the defendant and his family, judges, and others, and determined that it could—that it would not be helpful based on the plausible bases set out in the record.

Trial counsel's cross-examination of witnesses included reviewing and evaluating efficacy of using transcripts of previous witness testimony for potential impeachment purposes, counsel's lack of actually impeaching witnesses as to the minor discrepancies, due to— by using the transcripts in front of the jury, was due to trial strategy reasons, and such strategic decision had a plausible basis in the record.

Trial counsel's cross-examination of extraneous offense witnesses, including punishment witnesses, specifically Castro, was not objectively unreasonable, and not deficient as a trial strategy, as recited in the record, at a plausible basis.

Nine, trial counsel did not call any witnesses to attack the credibility of the complaining and outcry witnesses . . . due to trial strategy and other reasons recited in the record. Such strategic decision had a plausible basis, as cited in the record.

15

Ten, trial counsel's representation did not fall below an objective standard of reasonableness, in his pretrial investigation and preparation and in the actual trial of this case.

Trial counsel met many times with the defendant and his family, and trial counsel hired expert, Aaron Pierce and decided against using him at trial, due to the potential that his expert testimony could have backfired against the defendant, and used against defendant's defensive issues.

Trial counsel didn't call Officer Munoz because of trial strategy, reasons set out in the record. Namely, that he was a cagey witness, and that he was hostile, and for other . . . plausible bases set out in the record, which included minimal benefit of putting him on the stand.

Eleven, defendant has failed to establish that any errors or omissions of guilt or innocence phase of the trial fell below an objective standard of reasonableness.

Twelve, defendant has failed to establish that any errors or omissions at the punishment phase of the trial, fell below the objective and objective standard of reasonableness.

Thirteen, not having shown deficient performance by trial counsel, defendant has failed to establish by a preponderance of the evidence, that trial counsel's performance was deficient. Nor has defendant established that there is a reasonable possibility, that but for trial counsel's unprofessional error as the result of proceeding would have been different in the guilt or innocence phase, as well as the punishment phase.

The Court finds that there were two trials here, and different evidence, different strategies, different juries, different approaches.

. . . .

Accordingly, based upon the credible evidence at this hearing . . . and based upon all the circumstances in this trial and developed at that hearing, the Court finds that trial counsel's performance was objectively reasonable, and not deficient, and that he rendered effective assistance of counsel.

Appellant's motion for new trial was overruled by operation of law.

16

## Standard of Review

To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden of establishing both *Strickland* prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Appellant presented his ineffective-assistance claim to the trial court in a motion for new trial and received a hearing on his motion. We, therefore, analyze

17

his issue under an abuse of discretion standard as a challenge to the denial of his motion. *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Biagas*, 177 S.W.3d at 170. If there are two permissible views of the evidence, the trial court's choice between them cannot be held to be clearly erroneous. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 112. We note that trial courts are in the best position to "evaluate the credibility" of witnesses and resolve conflicts in evidence. *See Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). And a trial court may choose to believe or disbelieve all or any part of the witnesses' testimony. *See id.* at 234.

When reviewing a trial court's fact-findings, we afford almost total deference to those findings when they are based on an assessment of credibility and demeanor. *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007).

We generally accept a trial court's findings of fact when they are supported by the record. *Id.* However, we review a trial court's conclusions of law de novo. *Id.* at 853.

## Ineffective Assistance of Counsel

In his first and second issues, appellant argues that his trial counsel, Floyd, provided him with ineffective assistance during the guilt phase of trial because Floyd failed to "secure the attendance of multiple witnesses" and impeach the complainant with her "multiple prior inconsistent statements." *See* U.S. CONST. amends. VI, XIV. In his third issue, appellant argues that Floyd provided him with ineffective assistance during the punishment phase of trial because Floyd failed to present mitigating evidence and "impeach the State's punishment evidence." *See id*.

### *Witnesses*

In regard to appellant's first issue, we note that a criminal defense attorney has a responsibility to his client to conduct a legal and factual investigation of a case and to seek out and interview potential witnesses. *Ex parte Duffy*, 607 S.W.2d 507, 517 (Tex. Crim. App. 1980); *Rodd v. State*, 886 S.W.2d 381, 384 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). When challenging an attorney's failure to call a particular witness, a defendant must show that the witness was available to testify and that his testimony would have been of some benefit to the

defense. *See Ex parte Ramirez*, 280 S.W.3d at 853. The decision whether to present witnesses is largely a matter of trial strategy. *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd).

Appellant asserts that he "had available at trial, the testimony of several members of [his] family who would have been able to contradict many of the [complainant's] allegations." Specifically, Joanna would have "contradicted the complainant's assertion that [Joanna] was asleep when [appellant] returned home from work on the night in question" because she was "never" asleep when he came home at night. Joanna and his children would have "refute[d] the complainant's testimony that on the night in question, [the children] were sleeping on the floor" and appellant made a sandwich for himself. Joanna would have testified that she and appellant had "informed the complainant a few days before her initial outcry that she could not move in with them because she was too problematic a child at that time." And Joanna and one of his children would have been able to offer their opinions as to the complainant's reputation for truthfulness.

Appellant further complains that although the complainant had "admitted during her therapy sessions [with Dr. Meeds] to having a very tumultuous relationship with her father and that she was abusing alcohol, marijuana, and pain pills during the time she decided to make her initial outcry to her aunt," Floyd did not call Meeds to testify. He also did not call Cook, who had assisted with treating

20

the complainant's "bipolar disorder," or Dr. Pierce, whom he had hired as an expert, to assist with the defense. And Floyd did not call Officer Munoz to testify about the complainant's parents' initial report, which included an allegation against appellant of "penile penetration."

As discussed above, Floyd testified about the extensive investigation that he undertook in preparing for trial, and the trial court admitted into evidence his notes, in which he detailed his investigation and preparation. Floyd also testified that, because nobody knew when the night in question had occurred, neither Joanna nor appellant's children could affirmatively state whether, "on the night in question," Joanna was asleep, anyone was asleep on the floor in the living room, or appellant made food for himself. Appellant's children and the complainant's sister "were not eyewitnesses" to anything relevant, and they "could not affirmatively answer" whether they were even present at appellant's home "on the night in question." As appellant asserts in his brief, his children "would have testified that they did not have any recollection of the events in question."

Floyd further testified that he and his investigator spoke with Joanna several times, and she told them that she was only "usually" awake when appellant returned home from work at night. And in the investigator's report, which the trial court admitted into evidence, it is noted that appellant's daughter stated that the children, "a lot of time[s]," slept on "the pull out couch or [on] pallets on the

21

floor." Moreover, Floyd explained that he, through his investigation, learned that everyone who knew anything about appellant having refused a request by the complainant to move into the Brioneses' house had heard about it directly from appellant. Floyd could not find anyone who could independently corroborate the matter.

Floyd also learned from his investigator's discussion with the jury foreman from appellant's first trial that the testimony of appellant's family members had "carried no weight." Floyd explained that he, "having read the transcripts from the previous trial," determined that "a lot of times all they did was corroborate a lot of [the complainant's] story." And he was concerned that if he called appellant's close family members to testify, he could open the discussion to questions about appellant's extensive negative history, which the State had in its file. This history included the fact that in 2005, Joanna had telephoned for emergency assistance in regard to appellant; his daughter had also made an outcry to Pena about an allegation involving him; he had resigned from his job because of the Castro matter; he was married to another woman when he met and had a child with Joanna; and he was married to Joanna when he met and had a child with Esquivel.

Floyd further testified that he did not present the testimony of Dr. Meeds because she was retired, resided outside the subpoena range of the trial court, and was unwilling to make herself available for trial. *See Ex parte Ramirez*, 280

S.W.3d at 853 (when challenging defense counsel's decision not to call particular witness, defendant must show witness available to testify). She was also hostile toward the defense. And although she had testified at the prior trial that the complainant suffered from post-traumatic stress disorder and had issues with alcohol and narcotics, Meeds had opined that the complainant's conduct was attributable to appellant's sexual abuse. In fact, Floyd learned from the jury foreman from the first trial that Meeds's testimony had "cement[ed]" in the juror's minds that the sexual abuse had actually occurred. Moreover, Floyd did not call Cook to testify because she had said only that the complainant "might" have bipolar disorder and "other things that support[ed] or corroborate[d] the incident." Thus, any potential benefit from Cook's testimony was outweighed by the potential harm she could have caused to appellant.

Floyd also explained that although he had hired Dr. Pierce as an expert to support the defense, Pierce agreed with the opinion of the State's expert, Mullin, that the sexual abuse had occurred. He "didn't need him to get up there [on the witness stand to] corroborate the State's witnesses." And Floyd did not call Officer Munoz to testify because Munoz was "extremely interested in helping the State in this case." He told Floyd that he was "willing and prepared to testify that he could have made a mistake" in writing the details that the complainant's parents had given him when they initially reported the offense to him.

23

Again, the decision of whether to present witnesses is largely a matter of trial strategy. *Shanklin*, 190 S.W.3d at 164. Here, the record indicates that Floyd made a reasonable factual investigation and sought out and interviewed potential witnesses for appellant's defense. *See Ex parte Duffy*, 607 S.W.2d at 517; *Rodd*, 886 S.W.2d at 384; *see also McAfee v. State*, No. 01-03-01041-CR, 2004 WL 2966361, at *4 (Tex. App.—Houston [1st Dist.] Dec. 23, 2004, no pet.) (not designated for publication). Floyd testified that some of the potential witnesses had no recollection of the events at issue and would not have benefited the defense. And counsel is not ineffective for not calling a witness who would not have been beneficial to the defense. *See Ex parte Ramirez*, 280 S.W.3d at 853; *Pinkston v. State*, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (counsel not ineffective for not calling witnesses where no showing they remembered location of defendant at time of offense); *see, e.g., Westerman v. State*, No. PD-1314-05, 2006 WL 2694388, at *8 (Tex. Crim. App. Sept. 20, 2006) (decision not to call witnesses constituted sound trial strategy where none of defendant's potential witnesses had any personal information concerning complainant's accusations or could provide any account of what had occurred).

Further, Floyd testified in detail that he and appellant decided not to call some of the potential witnesses in order to avoid bringing out testimony that would have been harmful to the defense. "[W]hen in counsel's reasonable judgment, a

possible witness is as potentially dangerous as he or she might be helpful, it is not ineffective assistance to not call the witness to the stand." *Damian v. State*, 881 S.W.2d 102, 110 (Tex. App.—Houston [1st Dist.] 1994, pet. denied); *see Hale v. State*, 140 S.W.3d 381, 393–94 (Tex. App.—Fort Worth 2004, pet. ref'd) (decision not to call potential witnesses during the guilt phase of trial to avoid exposing witnesses to cross-examination and "have you heard" questions concerning extraneous offenses constituted sound strategy); *see also Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) ("A defense strategy that avoids the introduction of extraneous offenses under Rule 404(b) is not constitutionally ineffective."). "That other counsel might have made a different decision regarding whether to talk to or call the witness to the stand does not render trial counsel's assistance ineffective." *Damian*, 881 S.W.2d at 110.

Accordingly, we hold that appellant has not shown that Floyd's decision not to secure the attendance of certain witnesses fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Lopez*, 343 S.W.3d at 143–44.

### *Impeachment*

In his second issue, appellant asserts that although the complainant was "the most critical witness for the State and the entire case hinged on her credibility," Floyd did not attempt to impeach her with her prior inconsistent statements about

25

appellant's movements in the house on the night in question. He further asserts that his children could have testified about the complainant's reputation for truthfulness and her sister "would have testified that the complainant is a manipulative liar and a troublemaker." Appellant further complains that Floyd failed to impeach the complainant's testimony that she was depressed and angry when her social media postings, in contrast, suggested that she was a "happy teenager"—specifically, a posting in which she stated, "If you upset me, you better get out of my way."

Generally, a party may impeach a witness with evidence of a prior inconsistent statement. TEX. R. EVID. 613(a); *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). And a witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. TEX. R. EVID. 608(a). A decision not to raise inconsistent testimony or impeach a witness may constitute sound trial strategy because the attempt to impeach may be more harmful than beneficial. *See Fernandez v. State*, No. 01-14-00334-CR, 2015 WL 1967618, at *4 (Tex. App.—Houston [1st Dist.] Apr. 30, 2015, pet. ref'd) (mem. op., not designated for publication); *Harris v. State*, No. 01–88–00991–CR, 1990 WL 39468, at *4 (Tex. App.—Houston [1st Dist.] Apr. 5, 1990, pet. ref'd) (not designated for publication).

26

Appellant asserts that the complainant testified at the first trial that on the night in question, he came home and went into his bedroom before going into the kitchen, he adjusted her blanket after leaving the kitchen, he returned to the kitchen for five to ten minutes, and she was able to see him in the kitchen because of the light from the refrigerator. However, in the second trial, the complainant testified that when appellant came home, he went straight into the kitchen, he adjusted her blanket before going into the kitchen, he went from the kitchen to his bedroom, and she could not see, but only hear, appellant in the kitchen.

Floyd testified that he extensively reviewed the transcript from the first trial and was aware of these variations in the complainant's testimony. However, he did not find these differences to be significant, given her delayed outcry, and the fact that she was recalling events from ten years prior. *See Ex parte McFarland*, 163 S.W.3d at 756 (counsel not ineffective for not questioning witness who testified before grand jury that applicant discussed murder while at family member's house, but further testified at trial they discussed murder while riding in car because constituted "impeachment on a relatively minor issue"). Floyd explained, "When you start hounding someone about these small []discrepencies, a jury's not going to follow you." He was "looking for major contradictions" and was "prepared to address those." Further, as discussed above, Floyd gave strategic reasons for not calling Joanna and appellant's children for any purpose. *See Cano*

27

*v. State*, No. 14-06-00377-CR, 2007 WL 2872418, at *6 (Tex. App.—Houston [14th Dist.] Oct. 4, 2007, pet. ref'd) (mem. op., not designated for publication).

Moreover, based on the interview of the jury foreman from the first trial, Floyd concluded that the use of the complainant's social media postings in the prior trial seemed to have alienated the jury because it was perceived as an attempt to use "normal teenage behavior" to impeach her. And he noted that the specific posting of which appellant complains, "If you upset me, you better get out of my way," actually shows that the complainant was angry.

Accordingly, we hold that appellant has not shown that Floyd's decision not to impeach the complainant with her previous inconsistent statements, her reputation for truthfulness, and her social media posts, fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Lopez*, 343 S.W.3d at 143–44.

### Punishment-Phase Evidence

In his third issue, appellant complains that although "the State called numerous witnesses" against him during the punishment phase of trial, Floyd "called only one witness, [his] sister, Oralia Schmidt," on his behalf. He asserts that Floyd "did not offer evidence from [his] previous employers," who "provided favorable character evidence on [his] behalf at [his] previous trial" or offer evidence of his "honorable military service."

In considering whether trial counsel failed to present mitigating evidence, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence was reasonable. *Wiggins v. Smith*, 539 U.S. 510, 522–23, 123 S. Ct. 2527, 2536 (2003); *Goody v. State*, 433 S.W.3d 74, 80 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). "While '*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence,' 'counsel can . . . make a reasonable decision to forego presentation of mitigating evidence [only] after evaluating available testimony and determining that it would not be helpful.'" *Goody*, 433 S.W.3d at 80–81 (alterations in original) (quoting *Wiggins*, 539 U.S. at 533, 123 S. Ct. at 2537; *Milburn v. State*, 15 S.W.3d 267, 270–71 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)). An attorney's decision not to investigate or to limit the scope of the investigation is given a "heavy measure of deference" and assessed in light of all circumstances to determine whether reasonable professional judgment would support the decision. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. However, a failure to uncover and present mitigating evidence cannot be justified if counsel has not conducted a thorough investigation of the defendant's background. *Shanklin*, 190 S.W.3d at 164; *see also Gonzalez v. State*, No. 01-12-01115-CR, 2014 WL 7205145, at \*4 (Tex. App.—Houston [1st Dist.] Dec. 18, 2014, pet. ref'd) (mem. op., not designated for publication).

In addition to establishing a deficiency in counsel's performance, a defendant must show that a reasonable probability exists that the jury's assessment of punishment would have been less severe in the absence of counsel's deficient performance. *Bazan v. State*, 403 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Our prejudice analysis turns on whether counsel's deficiency "made any difference to the outcome of the case." *Riley*, 378 S.W.3d at 458. It is not enough to show that trial counsel's errors had some "conceivable" effect on the outcome of the punishment assessed; the likelihood of a different result must be "substantial." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787, 792 (2011).

Here, the evidence admitted at the new-trial hearing shows that in 2003, two years prior to the complained-of conduct, two trial court judges wrote letters commending appellant for his work as a bailiff in their courtrooms. One of the judges commended appellant for his work "over the past 10 days." And the other commended appellant for his work while a regularly scheduled bailiff was "on vacation." Appellant notes that another trial court judge, for whom he was a bailiff for four years, testified on his behalf at his first trial.

Floyd testified that he reviewed the letters and previous testimony. He also reviewed the State's file, noting that it contained numerous documents regarding appellant's work history, including reprimands that he had received while working as a bailiff. Floyd explained that the judges' letters of commendation were written

30

before the letters of reprimand and he was concerned that if he presented the judges to testify about appellant's good character, the State would cross-examine them about appellant's subsequent disciplinary history, including the circumstances surrounding his resignation from the HCSO. Floyd was also concerned that the State could emphasize appellant's status as a peace officer and capitalize on the higher level of trust involved in his duties. Floyd, who viewed the State's file two weeks prior to trial, further noted that the State had done "a lot of background work on [appellant's] punishment witnesses" and, based on its evidence, was "building a case that appellant was using his connections as someone in the courthouse to try to manipulate the system to take advantage of people." Thus, Floyd decided that focusing on appellant's law-enforcement credentials and presenting testimony from the judges "would likely backfire."

Further, Floyd testified that he, in regard to putting Joanna and appellant's children on the stand during the punishment phase, interviewed each of them and, in his professional judgment, "there was just too much extraneous conduct out there," most of which was included in the State's notice to the defense. Floyd chose to present Oralia Schmidt because "she actually knew the least of this conduct." And, contrary to appellant's assertions, Schmidt testified about his history in the military, that he worked hard and had two jobs, and that he took care of his mother.

31

"The decision not to call witnesses at the punishment phase is a tactical maneuver and may, in certain instances, be a wise procedural move." *See Dyer v. State*, No. 01-88-00549-CR, 1989 WL 6997, at *2 (Tex. App.—Houston [1st Dist.] Feb. 2, 1989, pet. ref'd) (not designated for publication); *see, e.g.*, *Moore v. State*, 700 S.W.2d 193, 206 (Tex. Crim. App. 1985) (decision not to call witnesses at punishment stage of capital murder trial not ineffective assistance of counsel). Here, Floyd investigated potential witnesses, and he articulated several reasons supporting his decision not to present character witnesses in mitigation of punishment. *See Shanklin*, 190 S.W.3d at 164.

Accordingly, we hold that appellant has not shown that Floyd's decision not to "offer evidence from [his] previous employers" during the punishment phase of trial fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Lopez*, 343 S.W.3d at 143–44.

### *Impeachment*

Appellant next argues that Floyd failed to "impeach the State's punishment evidence." Appellant asserts that the State, during its cross-examination of Schmidt, improperly averred that he had failed to pay child support to Esquivel, and Floyd "failed to correct this impression."

During the punishment phase, evidence may be offered as to any matter the trial court deems relevant, including the prior criminal record of the defendant, his

general reputation, his character, or an opinion regarding his character. TEX. CRIM. PROC. CODE ANN. § art. 37.07. Floyd testified at the new-trial hearing that he did not object when the State elicited testimony from Schmidt about appellant's failure to pay child support because it was "proper punishment evidence," admissible under article 37.07, and, based on his discussions with appellant, the allegation was "substantially true." An attorney's decision not to object to admissible testimony does not constitute ineffective assistance. *Cooper v. State*, 707 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). And Floyd noted that the child support record admitted into evidence at the new-trial hearing showed that appellant had been "catching up" on prior missed payments.

Appellant further asserts that Floyd failed to object to Dr. Thompson's testimony that "[t]he only way to be certain a sex offender is not going to reoffend[] is to incarcerate them." He complains that although Floyd had an expert, Dr. Pierce, "who was available and could have 'definitely' challenged Thompson's testimony," he did not call him to testify.

Floyd explained that, in his professional judgment, Thompson's testimony "had limited effectiveness." During his cross-examination of Thompson, Floyd elicited testimony clarifying that Thompson was specifically discussing "pedophiles," and Thompson agreed that "not all people who act out against children are necessarily pedophiles." Thompson noted that "the only way to make

33

[a] diagnosis" that a person is a pedophile is to "talk with" the person "one-on-one." And Floyd prompted Thompson to admit that he did not know the facts of this case and had never spoken with appellant. Thompson further admitted that there are treatment programs available to sex offenders "on the outside" of prison.

Floyd further explained that he did not call Dr. Pierce to testify during the punishment phase because he was able to limit any harmful effect of Thompson's testimony through cross-examination. Further, he was concerned that the State would cross-examine Pierce regarding his opinions on the treatment options available for sex offenders. And Pierce would have testified that the first step involved in sex-offender treatment is for the offender to admit to having committed an offense. Floyd noted that the State had already asked Schmidt whether appellant had admitted that he had committed the offense, and Schmidt had answered that appellant had continued to deny it.

Again, Floyd investigated whether to present the testimony of Dr. Pierce and articulated reasons supporting his decision not to present him as a witness in mitigation of punishment. *See Shanklin*, 190 S.W.3d at 164.

Accordingly, we hold that appellant has not shown that Floyd's decision to not call Dr. Pierce to testify and to not object to the testimony of Schmidt and Dr. Thompson fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Lopez*, 343 S.W.3d at 143–44.

## Conclusion

Having held that appellant has not shown that his trial counsel's performance fell below an objective standard of reasonableness,[5] we further hold that the trial court did not err in denying appellant's motion for new trial.

Accordingly, we overrule appellant's three issues.

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish.   TEX. R. APP. P. 47.2(b).

---

[5]    Because appellant has not shown that his trial counsel's performance was deficient, we need not reach the prejudice prong of *Strickland. See Strickland v. Washington*, 466 U.S. 668, 697, 694, 104 S. Ct. 2052, 2069 (1984); *Mallett v. State*, 65 S.W.3d 59, 68 (Tex. Crim. App. 2001); *Cloud v. State*, No. 01-05-00817-CR, 2007 WL 1228630, at *6 (Tex. App.—Houston [1st Dist.] Apr. 26, 2007, no pet.) (mem. op., not designated for publication).