**Opinion issued October 25, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-01049-CR

————————————

**JOSE LUIS BAZAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1250348**

---

## O P I N I O N

A jury found Jose Luis Bazan guilty of the first-degree felony offense of aggravated robbery with a deadly weapon. After finding true the allegation in the enhancement paragraph—that Bazan previously had been convicted of felony robbery—the jury assessed his punishment at life imprisonment. *See* Tex. Penal

CODE ANN. § 29.03 (West 2011).  Following his conviction, Bazan discharged his trial counsel and retained new counsel, who moved for a new trial, contending that trial counsel was ineffective because he failed to investigate and subpoena witnesses to testify on Bazan's behalf during the punishment phase of the trial. After a hearing, the trial court found that Bazan did not show that he was prejudiced by any failing of trial counsel; thus, it denied Bazan's request for a new trial.

Bazan appeals, contending that the trial court abused its discretion in denying his motion for a new trial.  We hold that it did not, and we therefore affirm.

**Background**

In February 2010, Irma Solis was walking with her daughter outside their home when she noticed that someone had broken into her husband's truck.  She walked inside the house to tell her husband about the incident.  Irma returned outside with her daughter.  A man, later identified as Jose Bazan, confronted them with a pointed shotgun and directed them back into their house.  At Bazan's order, the Solis family searched each room in their house for valuables and turned them over to Bazan.  Bazan then ordered Antonio Solis back outside.  He demanded that Solis help him load the stolen items into Solis's truck.  Bazan also loaded the truck. As Bazan loaded the truck, his attention strayed from his efforts to hold the family

2

at gunpoint, which presented an opening for Solis. Solis grabbed the shotgun and turned it on Bazan, then hit him, tied him up, and called the police.

*Punishment phase*

During the punishment phase of the trial, the State introduced testimony that, while the police transported him to the central jail, Bazan had threatened that he would take the lives of Solis and his family. The State introduced evidence that Bazan previously had been convicted of aggravated robbery. Bazan also had been convicted of burglary of a building with intent to commit theft (twice), and of attempted deadly conduct.

Bazan committed a second aggravated robbery the night before he robbed the Solis family. The State elicited testimony about this extraneous offense. Lexie Turner and Justin Brewer testified that Bazan and an unidentified accomplice broke into Brewer's business, shot each of them multiple times, and stole money from Brewer's safe. Turner and Brewer each sustained shotgun wounds to the torso, back, and groin.

Finally, the State introduced testimony from Bazan's ex-girlfriend, Bethany Spell. She testified that, in March 2007 when she was eight weeks pregnant, Bazan had held her at knifepoint during an altercation. He grabbed her ponytail and slammed her head against the kitchen floor. Bazan fought with her about the pregnancy, because he did not want to have anything to do with the baby.

3

Bazan chose to testify in his defense against counsel's advice. Bazan informed the trial court that it was his desire to testify. Bazan confirmed on the record that his trial counsel had discussed the risks associated with Bazan's testifying. Bazan also confirmed on the record that he did not want his mother to testify on his behalf during the punishment phase.

In his testimony, Bazan told the jury that he had approached the Solises' house after the Brewer robbery. The night of the Brewer robbery, he had been shooting heroin, and had agreed to participate in a murder for hire in exchange for $20,000 and drugs. Bazan testified that the murder-for-hire scheme required him to go to Brewer's business, brandish a shotgun, and create "chaos" while an accomplice killed the intended target. In furtherance of this plan, Bazan accompanied a friend to the business carrying guns, including "two AKs." Bazan told the jury that all did not go according to the plan, because neither he nor his accomplice had killed anyone that evening.

Bazan testified that he had considered killing Antonio Solis during the robbery, but he decided he would not. Trial counsel asked Bazan if he understood that he could be sentenced anywhere from fifteen years' confinement to life in prison for the Solis robbery. Bazan replied, "Yes. I mean, I've been locked up, you know—my whole life. You can give me life. You can give me a life sentence."

4

On cross-examination, Bazan testified that he had shot Lexie Turner with a shotgun during the Brewer robbery, and was paid to "make sure [the] shotgun was fired and make sure that it was secured in case they had guns, and we had other guns in case they did." The State asked Bazan whether he knew that if Turner had died he would have faced a capital murder charge. Bazan replied, "I'm going to do what I have to do." Bazan also conceded that he previously had been convicted of felony aggravated robbery after he broke into an apartment and held two women at knifepoint in order to steal a kilogram of cocaine from them.

Trial counsel offered Bazan's medical records into evidence. Those records included a diagnosis that Bazan was alcohol and opiate dependent, and that doctors had ordered medical treatment for withdrawal symptoms.

Trial counsel called no further witnesses to testify on Bazan's behalf during the punishment phase. In closing arguments, Bazan's counsel asked for leniency, requesting that the jury consider Bazan's drug dependency and difficult life circumstances as mitigating factors. Counsel asked the jury to assess no more than thirty years' confinement.

*Hearing on the motion for new trial*

At the motion for new trial hearing, trial counsel testified that he had considered offering the testimony of Bazan's mother—who was present throughout the trial—during the punishment phase, but abandoned that plan after Bazan

5

specifically instructed that she not testify. Trial counsel also testified that he had retained a private investigator on Bazan's behalf; that investigator had located Bazan's medical records, had interviewed witnesses, and had obtained information about two possible witnesses to testify during the punishment phase—Bazan's mother and a girlfriend. Trial counsel spoke with Bazan's mother a few days before the trial.

Bazan produced affidavits from twelve witnesses, including his mother, who generally averred that they would have testified that Bazan is a good person, a responsible and good father to his son, and one witness noted that Bazan suffered from a broken home and "sense[d] that [he] has some kind of learning disability."

At the motion for new trial hearing, Bazan also introduced live testimony from four witnesses: his mother, a pastor, and his son's mother and step-father. Bazan's mother stated that her calls to trial counsel went unreturned. But she acknowledged that when trial counsel spoke with her a few days before trial, she told him that she was unsure of her testimony. She confirmed that she was present throughout the trial. At the new trial hearing, she testified that she would have told the jury that her son was a good-hearted, helpful person when he was not on drugs.

Pastor Willie Montgomery testified that Bazan's uncle attends Montgomery's church. About three years ago, Bazan's uncle asked that Pastor Montgomery to visit Bazan while he was incarcerated. Pastor Montgomery did.

6

After Bazan was no longer in jail, Bazan visited Pastor Montgomery's church on Sundays for about three months. Pastor Montgomery found Bazan to be someone who did not make excuses for what he had done, had a pleasant attitude, and after observing him often carrying his son while at church, believed him to be a good father. He acknowledged that he had not seen Bazan in about three years.

Troy Clifton, Bazan's son's step-father, testified. He stated that he had met Bazan five years ago when Bazan was in prison. When out of prison, Bazan would visit with his son at Bazan's mother's house every couple of weekends. Clifton had a good relationship with Bazan, and had considered going into the moving business with him. He believed that Bazan was a good father, and that his stepson needed him. However, Clifton admitted that he did not know about the details of the Brewer and Solis robberies, and he supposed that knowing about them changed his opinion of Bazan. He also conceded that a person who held a woman at knifepoint might be a dangerous individual.

Finally, Margaret Ibarra, who is the mother of Bazan's son, testified. She stated that Bazan was incarcerated at the time her son was born, and off and on throughout her son's childhood. But Bazan is a good father when not in prison and visits his son. She noted that Bazan often tells his son not to make the same mistakes that Bazan has made. In this way, Bazan has had a positive effect on his son's life, because her son is a good boy, now aged 14. She did not know about

7

the recent crimes, and she did not believe that Bazan would ever use a gun or hit a woman.

The trial court denied Bazan's motion for new trial. The court concluded that Bazan's trial counsel was deficient for failing to adequately investigate possible additional witnesses to testify on Bazan's behalf during the punishment phase. But it further found that Bazan had not shown that he was prejudiced by his trial counsel's performance, because the potential testimony of these witnesses would not have resulted in a different sentence. Concluding that Bazan had not demonstrated prejudice as a result of deficient performance, the presiding judge emphasized the demeanor of all of the witnesses, including Bazan, and stated, "Probability that a jury's verdict would be different? No."

## Discussion

*Standard of review and applicable law*

We review Bazan's challenge to the denial of his motion for new trial based on ineffective assistance under an abuse of discretion standard, reversing "only if the trial judge's opinion was clearly erroneous and arbitrary." *Riley v. State,* No. PD-1531-11, 2012 WL 4092874 at *2 (Tex. Crim. App. Sept. 19, 2012). We view the evidence in the light most favorable to the trial court's ruling, must not substitute our judgment for that of the trial court, and must uphold the ruling if it was within the zone of reasonable disagreement. *Id.*; *Wead v. State*, 129 S.W.3d

8

126, 129 (Tex. Crim. App. 2004) (under abuse of discretion standard, appellate court must uphold trial court's ruling if within zone of reasonable disagreement). If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Riley*, 2012 WL 409 2874, at *2. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support its ruling. *Id.; Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) his counsel's performance was deficient and (2) a reasonable probability exists that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Andrews v. State*, 159 S.W.3d 98, 101–02 (Tex. Crim. App. 2005). A defendant has the burden to establish both prongs by a preponderance of the evidence; failure to make either showing defeats his ineffectiveness claim. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); *see Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

This case turns on the application of *Strickland*'s second prong to the assessment of punishment for the crime. With respect to the second prong, "appellate courts must show almost total deference to a trial court's findings of historical fact as well as mixed questions of law and fact that turn on an evaluation

9

of credibility and demeanor." *Riley*, 2012 WL 4092874, at *3. A defendant must show that a reasonable probability exists that the jury's assessment of punishment would have been less severe in the absence of defense counsel's deficient performance. *Rivera v. State*, 123 S.W.3d 21, 32 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).

*Analysis*

The jury imposed a life sentence— the maximum applicable sentence in the punishment range of fifteen years' confinement to life. *See* TEX. PENAL CODE ANN. § 12.42. We agree with Bazan that the record supports the trial court's conclusion that trial counsel was ineffective in failing to investigate the possibility of additional mitigation witnesses. *See Lair v. State*, 265 S.W.3d 580, 594–95 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (counsel ineffective in drug possession case when he failed to investigate and call witnesses who were available and willing to testify on defendant's behalf); *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd improvidently granted) ("[F]ailure to uncover and present mitigating evidence cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background.") (citing *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003)). We thus turn to examine whether the

10

record supports the trial court's second-prong finding that the mitigation evidence that Bazan adduced at the new trial stage fails to show a probable likelihood that the jury would have assessed a different punishment had it heard that evidence. We conclude that the record supports this finding as well; thus, this trial court did not abuse its discretion in reaching it.

First, considerable evidence supports the jury's maximum sentence. Bazan himself invited the jury to sentence him to life in prison, stating that he had already spent time in prison and directing: "You can give me life. You can give me a life sentence." Bazan also admitted that he had participated in an attempted murder-for-hire plot just before he robbed the Solis family, and that that he had shot Turner and Brewer. He demonstrated no remorse for any of his prior bad acts, testifying "I'm going to do what I have to do." The State presented evidence that Bazan had a previous conviction for aggravated robbery, the same type of offense for which the jury found him guilty, in which he had held the complainant at knifepoint. The State also proved that Bazan had threatened the lives of the Solis family after his arrest. Finally, the State presented testimony from Bazan's ex-girlfriend that he assaulted her while she was pregnant. The evidence supporting the sentence weighs heavily against any mitigating evidence that could have been proffered.

Second, the proffered mitigation evidence is not strong. Citing our opinions in *Shanklin* and *Lair*, Bazan contends that the witnesses he presented in support of

his motion for new trial demonstrate the probability that he would have received a lighter sentence. *See Lair*, 265 S.W.3d at 595–96; *see also Shanklin*, 190 S.W.3d at 165–66. In *Shanklin*, we concluded that the defendant had demonstrated prejudice as a result of trial counsel's failure to call any witnesses to testify on the defendant's behalf during the punishment phase of trial. *Shanklin*, 190 S.W.3d at 164–66. Similarly, in *Lair*, we held that the defendant had been prejudiced when he was sentenced to seventy years' confinement for possession of a controlled substance, and counsel presented general testimony from a single witness, but failed to call over twenty witnesses who were willing to testify to the defendant's honesty through specific acts. *Lair*, 265 S.W.3d at 593–95. The proffered testimony in *Lair* was that the defendant worked countless hours to support his family's daily needs, spent time working with his children to improve their grades and involve them in extracurricular activities, demonstrated honesty through specific acts, and that the defendant was an honest, capable member of the community. *Id.* at 593–94. The defendant in *Lair* did not testify. *Id.* at 588. Considering the proffered mitigation testimony and counsel's statements that neither he nor the jury really knew the defendant, we concluded in *Lair* that trial counsel's failure to produce the mitigating testimony likely resulted in prejudice. *Id.* at 594–96.

Bazan's proffered new trial testimony does not match the proffers in *Lair*. It consists of twelve brief affidavits and four witnesses. Their testimony provides generally that Bazan is a good father, and has faced adversity in his life. The specific examples of mitigating conduct that these witnesses proffer are that Bazan had: (1) helped around two affiants' houses; (2) sometimes driven his grandmother to the grocery store; (3) helped a fellow inmate; (4) bought gasoline for his girlfriend; and (5) occasionally bought things for his son. The proffered testimony in *Lair* provided numerous, specific instances of good conduct toward the defendant's family and community, while Bazan's mitigation testimony consists of non-particular statements that he is a good person and five instances of good conduct. *See id.*

Bazan chose to testify on his own behalf during the punishment phase about his background and prior bad acts, after his counsel advised him of the risk of doing so. He presented some evidence in mitigation: he told the jury that he had a seventh-grade education, and that he had never matured because of the long time he had spent in prison. Trial counsel also introduced medical records demonstrating that Bazan had been diagnosed with a drug addiction necessitating treatment for withdrawal, and pleaded for leniency based on these problems. But during his testimony, Bazan did not exhibit any remorse and asked the jury for a life sentence. The defendant in *Lair* did not testify. Bazan's case also is different

13

from *Shanklin*, in which Shanklin testified on his own behalf during punishment as to his remorse for the crime, and apologized to the family of the decedent. *Shanklin*, 190 S.W.2d at 165. Given the different sort of punishment evidence presented, here the trial court was within its discretion to conclude that there was no substantial probability that the additional mitigating evidence provided at the new trial hearing could overcome Bazan's self-incriminating testimony and unrepentant demeanor.

Finally, the record provides no indication that Bazan would have permitted additional witnesses in his defense. *See Schriro v. Landrigan*, 550 U.S. 465, 480–81, 127 S. Ct. 1933, 1943–44 (2007) (mitigation testimony that mother used drugs during pregnancy would not have influenced court to impose different sentence where defendant requested death penalty and asked counsel not to present testimony from mitigation witnesses). This case is like *Schriro*, in which the Supreme Court observed, "[the defendant's] mitigation evidence was weak, and the post-conviction [fact finder] was well acquainted with [the defendant's] exceedingly violent past and had seen first-hand his belligerent behavior." *Schriro*, 550 U.S. at 481, 127 S. Ct. at 1944.

In *Schriro*, the defendant prevented trial counsel from presenting mitigation testimony during the punishment phase, specifically instructing his trial counsel not to present testimony from his birth mother and ex-wife. *Id.* at 469–70, 127 S.

14

Ct. at 1937–38. The defendant also invited the fact finder to impose the death penalty, just as Bazan invited life in prison. *Id.* at 470, 127 S. Ct. at 1938. The Supreme Court concluded that the Arizona state courts reasonably could have determined that the defendant had not demonstrated prejudice due to ineffective counsel, because he likely would have interfered with any mitigation evidence offered during the punishment phase, based on his instructions not to present two witnesses and his continued interference with trial counsel's attempts to proffer mitigation evidence. *Id.* at 476–77, 127 S. Ct. at 1941–42. Like the defendant in *Schriro*, Bazan instructed trial counsel not to present mitigation testimony from his mother, even though she was present and available throughout the trial. He also instructed trial counsel, in an "obvious" way in front of the jury, to refrain from cross-examining Spell, and he invited the jury to assess the maximum sentence. Bazan offered no evidence in the new trial record to show that, despite his earlier desire that trial counsel refrain from presenting additional mitigation evidence, he nonetheless would have not have interfered with the mitigation testimony revealed at the new trial hearing. A different punishment assessment must not be just conceivable; its likelihood must be substantial. *See Harrington,* 131 S. Ct. at 792; *see also Riley,* 2012 WL 4092874 at *4.

15

## Conclusion

After evaluating the evidence in support of Bazan's sentence and the additional mitigation evidence proffered at the new trial stage, we conclude that the record supports the trial court's finding that Bazan has failed to demonstrate that the outcome of the punishment phase of his trial likely would have been different but for trial counsel's ineffectiveness. Accordingly, we hold that the trial court did not abuse its discretion in denying Bazan's request for a new trial. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

Publish. TEX. R. APP. P. 47.2(b).