**Nadia R. WILLIAMS, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 01–16–00781–CR**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 13, 2017

Rehearing Overruled July 25, 2017

Adam Banks Brown, Houston, TX, for Appellant.

Kim Ogg, District Attorney, Clint Morgan, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices Jennings, Huddle and Lloyd.

## OPINION

Russell Lloyd, Justice

After a hearing on the State's motion to adjudicate, the trial court found appellant, Nadia R. Williams, guilty of the third-degree felony offense of assault of a public servant, and assessed her punishment at ten years' incarceration. On appeal, appellant argues that her counsel was ineffective during the punishment phase of the adjudication hearing because her counsel failed to offer specific mitigating evidence.

We affirm the trial court's judgment.

## Background

Appellant pleaded guilty to the offense of assault of a public servant [1], pursuant to a plea bargain, and the trial court placed her on deferred-adjudication community supervision for three years. After the State filed a motion to adjudicate appellant's guilt, appellant sent the trial court a letter in which she explained her difficult childhood and her recent efforts to turn her life around, and asked the court for leniency. Appellant also informed the court that she had been raised in foster care and did not want the same for her own children. She also told the court that she had been depressed while she was on community supervision because she had recently learned that she had a medical condition.

During the adjudication hearing, appellant testified that she had recently been diagnosed with breast cancer and her daughter had been hospitalized while appellant was on community supervision. When asked if her circumstances had changed, appellant testified that she had "a good support system now," because she had a godmother who could watch appellant's children while she worked. When her counsel asked her if there was anything else that she wanted to tell the court, appellant answered, "No ma'am." Appellant's counsel did not offer appellant's letter into evidence during the hearing.

## Ineffective Assistance of Counsel

The standard of review for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington.* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Under the *Strickland* two-step analysis, a defendant must demonstrate that (1) her counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable

1. The record reflects that appellant pleaded guilty to that charge and judicially confessed

to striking a security officer with her hand while he was discharging an official duty.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687–88, 694, 104 S.Ct. at 2064, 2068; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An appellant bears the burden of proving her claims by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Appellate review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was *not* deficient." *Nava*, 415 S.W.3d at 307–08; *see Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. To rebut that presumption, a claim of ineffective assistance must be " 'firmly founded in the record,' " and " 'the record must affirmatively demonstrate' " the meritorious nature of the claim. *See Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Thus, the trial record alone is rarely sufficient to demonstrate an ineffective-assistance claim. *Nava*, 415 S.W.3d at 308. If trial counsel has not been afforded the opportunity to explain the reasons for his conduct, we will not find him to be deficient unless the challenged conduct was " 'so outrageous that no competent attorney would have engaged in it.' " *Id.* (quoting *Menefield*, 363 S.W.3d at 593); *Goodspeed*, 187 S.W.3d at 392; *see Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007) (noting "presumption that trial counsel's performance was reasonably based in sound trial strategy").

Appellant argues that she received ineffective assistance because her counsel failed to put appellant's letter into evidence or address the issues raised in the letter at the hearing. According to appellant, "there can be no explanation for the trial attorney not to put on any mitigating evidence since this clearly was the implemented trial strategy." The record, however, reflects that counsel did elicit testimony regarding some of the issues raised in the letter, i.e., appellant's breast cancer diagnosis and her employment status. Appellant's counsel also elicited testimony indicating, albeit indirectly, that appellant did not previously have a good support system to assist her in raising her children. Moreover, the record is silent as to why counsel decided not to introduce the letter into evidence or address some of the other issues raised in the letter, such as her time in the foster care system. Appellant has not rebutted the strong presumption that her trial counsel's performance was trial strategy within the range of reasonable professional assistance. *See Menefield*, 363 S.W.3d at 592.

Furthermore, after reviewing the record, including counsel's presentation of some mitigating evidence that was admitted through appellant's testimony, and appellant's testimony that there was nothing more that she wanted to tell the court, we cannot say that counsel's decision to not introduce additional mitigation evidence was " 'so outrageous that no competent attorney would have engaged in it.' " *Nava*, 415 S.W.3d at 308 (quoting *Menefield*, 363 S.W.3d at 593); *cf. generally Miller v. State*, 728 S.W.2d 133, 134–35 (Tex. App.–Houston [14th Dist.] 1987, pet. ref'd) (holding defense counsel's racial remarks during closing argument and other inflammatory comments "cannot be considered a reasonable trial strategy").

Appellant also perfunctorily contends that "the record is also clear that should [her] attorney have put on this mitigation evidence, the outcome would

have been different," without providing any substantive argument or analysis. Appellant's conclusory statement is insufficient to demonstrate the second prong of *Strickland*, i.e., that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687–88, 694, 104 S.Ct. at 2064, 2068; *see also Jackson*, 973 S.W.2d at 956 (stating defendant bears burden of proving ineffective assistance claim by preponderance of evidence). We further note that, despite the dissent's extended exegesis on the shortcomings of foster care, nothing in the record supports the conclusion that the result would probably have been different if the letter had been introduced.

Because appellant has failed to make a required showing of either prong under *Strickland*, we overrule appellant's sole issue. *See Williams*, 301 S.W.3d at 687.

### Conclusion

We affirm the trial court's judgment.

Jennings, J., dissenting.

Terry Jennings, Justice, dissenting.

Because the majority errs in holding that appellant, Nadia R. Williams, did not establish that she received ineffective assistance of counsel during the punishment phase of her adjudication hearing, I respectfully dissent.

After appellant, with an agreed punishment recommendation from the State, pleaded guilty to the offense of assault of a public servant,[1] the trial court deferred adjudication of her guilt and placed her on community supervision for three years. The State, alleging several technical violations of the conditions of her community supervision, subsequently moved to adjudicate appellant's guilt. After a hearing, the trial court found some of the State's allegations true, found appellant guilty, and assessed her punishment at confinement for ten years—the maximum punishment allowed by law.[2]

In her sole issue, appellant argues that her trial counsel did not provide her with effective assistance during the punishment phase of her adjudication hearing because counsel failed to present certain mitigating evidence to the trial court. Specifically, counsel failed to present evidence that appellant had been "raised in foster care and therefore had little to no support system" and had "severe difficulties in raising her children." Appellant asserts that such evidence "was critical for the [trial] [c]ourt to determine the proper outcome of [her] case."

The Sixth Amendment guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). To prove a claim of ineffective assistance of counsel, appellant must show that (1) her trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a

---

**1.** *See* Tex. Penal Code Ann. § 22.01(a) (Vernon Supp. 2016).

**2.** *See id.* § 12.34 (Vernon 2011) ("An individual adjudicated guilty of a felony of the third degree shall be punished by imprisonment in the Texas Department of Criminal Justice for any term of not more than 10 years or less than 2 years."); *see also id.* § 22.01(b)(1) (assault of public servant constitutes third-degree felony offense).

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs of the *Strickland* test by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). Specifically, in regard to her complaint about trial counsel's performance during the punishment phase of her adjudication hearing, appellant must establish that a reasonable probability exists that the trial court's assessment of punishment would have been less severe in the absence of counsel's deficient performance. *See Bazan v. State*, 403 S.W.3d 8, 13 (Tex. App.–Houston [1st Dist.] 2012, pet. ref'd).

Generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). However, where, as here, trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143.

As noted by the majority, appellant, after the State moved to adjudicate her guilt, sent a letter to the trial court. In her letter, she explained her very difficult situation, including the difficulties she experienced in raising her two children as a single mother, her struggles with depression after being diagnosed with breast cancer, and, most importantly, the fact that she had been raised in foster care and therefore had virtually no support system. Appellant further explained that she did not "w[a]nt to los[e]" her children "to the State like" her "mother did." And she emphasized the fact that, while growing up, she "didn't have a mother or a father to tell" her "right from wrong." Moreover, appellant noted that she had taken positive steps in her life, was employed, and had just moved into a house. She pleaded for an "opportunity" to be "better th[a]n" her mother and for a "chan[c]e[ ] at life with [her] kids." Notably, the State, in its briefing, does not dispute the assertions made by appellant in her letter to the trial court.

At the adjudication hearing, appellant, after the State presented evidence of her technical violations of the conditions of her community supervision, testified as the defense's only witness. Trial counsel's direct examination of her consists of only six pages of the reporter's record, with the focus of counsel's questions being on the alleged violations of her community-supervision conditions. Although trial counsel did ask appellant about the difficulties she had reporting to her probation officer due to the problems associated with her breast-cancer diagnosis and the health problems of her daughter, who had undergone surgery, this questioning only occurred in the context of the reasons why she was unable to timely report to her community-supervision officer. The only testimony counsel elicited concerning why appellant should be allowed to remain on community supervision, rather than sentenced to a term of imprisonment, was that she had a new "support system," namely, a godmother who had begun to help her with her children while she went to work.

Further, the trial court, after it found some of the State's allegations true and found appellant guilty, asked the defense specifically for "[a]ny evidence on punishment," to which appellant's counsel responded, "No, Judge." Notably, counsel

never asked appellant about the fact that she had been raised in foster care or the negative effects that it had on her childhood and well-being as an adult.

The extraordinary social and psychological problems that children suffer from having been removed from their parents and placed in Texas' foster-care system are indisputable and well documented. *See, e.g., M.D. v. Abbott*, 152 F.Supp.3d 684, 823, 828 (S.D. Tex. 2015) ("[A]s the system currently stands, foster children often age out of care more damaged than when they entered.... Years of abuse, neglect, and shuttling between inappropriate placements across the State has created a population that cannot contribute to society, and proves a continued strain on the government through welfare, incarceration, or otherwise. Although some foster children are able to overcome these obstacles, they should not have to.").[3] Many children raised in foster care are scarred for life and receive little to no support from the State, which has placed them there. Indeed,

> [f]or former foster care youths, exiting the foster care system is often a distressing time when they find themselves unprepared for the hard realities of

adulthood. Youths who "age out" are more likely than their peers to suffer from homelessness, be involved in criminal activity, be uneducated, be unemployed, experience poverty, and lack proper healthcare. *Youths receive little to no formal preparation from the state.* Most troubling is the irreversibility of aging out. Unlike other young adults who have the option of returning home during difficult times, foster care youths in most states do not have the option of reentering the foster care system once they age out. All states have cut-offs, established between the ages of eighteen and twenty-one, *after which a foster care youth is no longer eligible for any services or support.*

Melinda Atkinson, *Aging Out of Foster Care: Towards a Universal Safety Net for Former Foster Care Youth*, 43 HARV. C.R.–C.L. L. REV. 183, 183–85 (2008) (emphasis added) (internal footnote omitted) ("Current policy terminates all services and support to a former foster care youth instantaneously, often before the youth is ready for the responsibilities of adulthood.... These youths are struggling to survive and meet their basic needs with little to no

**3.** *See also* Robert T. Garrett, *Texas Foster–Care Crisis: Children Sleeping in CPS Offices Again as More Removed from Homes but State out of Places to Care for Them*, DALL. MORNING NEWS, Mar. 2016, https://www.dallasnews.com/news/politics/2016/03/17/texas-foster-care-crisis-children-sleeping-in-cps-offices-again-as-more-removed-from-homes-but-state-out-of-places-to-care-for-them ("Texas' foster-care system is strained with too many abused and neglected children and not enough places where they can heal and recover ...."); Neena Satija, *For Troubled Foster Kids in Houston Sleeping in Offices is "Rock Bottom,"* TEX. TRIBUNE, Apr. 20, 2017, https://www.texastribune.org/2017/04/20/texas-foster-care-placementcrisis/ ("You can see that in their face and in the[ir] demeanor ... they look tired, and some of them just look like they're hopeless. They've lost contact with

their family, and now they don't even have a place that wants them." (internal quotations omitted)); Alex Zielinski, *How Texas' Overburdened Foster Care System has Produced a Generation of Lost Adults*, SAN ANTONIO CURRENT, Jan. 17, 2017, http://www.sacurrent.com/the-daily/archives/2017/01/17/how-texas-overburdened-foster-care-system-has-produced-a-generation-of-lost-adults ("[C]hildren in state custody ... are essentially pushed out the door with a birth certificate, a few bucks, and serious trust issues. Many leave with undiagnosed mental health problems, often linked to the sexual, physical, or emotional abuse sustained in different foster homes.... With little preparation for the adult world, hundreds of these kids quickly slide into chronic homelessness or incarceration. Some might return to an abusive household or start one of their own.").

help from the government. Essentially, they have no safety net."). Further,

> [b]y definition, foster care youths have experienced trauma; they were removed from the homes of their biological parents due to abuse or neglect and often placed with strangers or in group homes. Children who survive abuse are more likely to have "problems in forming positive interpersonal relationships, physical and mental health problems, impaired cognitive development, reduced educational attainment, increased delinquency, and a greater likelihood to engage in high-risk behaviors." ·
>
> [And] while .individual experiences in foster care vary greatly, many problems persist as a result of frequent placement changes, inadequate supervision, careless foster families, and deficient group homes.... [In fact,] many of the problems facing former foster care youths stem in part from the treatment they received while in state care.

*Id.* at 183–84 (internal footnotes·omitted).

And many of those raised in foster care face serious economic challenges and are condemned to a life of poverty, homelessness, and crime:

> Foster youth face significant challenges in their quest to obtain gainful employment when they emancipate from the foster care system. These problems occur because the youth often leave foster care without the necessary resources and skills to enable them to be productive in society. The high unemployment rates among foster youth are compounded by problems faced when they attempt to gain adequate education and independent living skills. For example, the average seventeen-year old foster youth reads at a seventh grade level, making it very likely that she will not graduate from high school. This lack of education can lead to homelessness shortly after aging out of the foster care system. *In fact, many emancipated foster youth who have not received adequate emancipation preparation services turn to prostitution, drug dealing, and crimes of desperation just to survive.*

Farrah Champagné, *Providing for Proper Preparation: Achieving Economic Self-Sufficiency for Foster Youth,* 4 Am. U. Lab. & Emp. L.F. 1, 1–11 (2014) (emphasis added) (internal footnotes omitted) ("Many foster youth receive little to no instruction about how to survive in the adult world, and as a result many of them face a losing battle ...."); *see also Atkinson, supra,* at 183–85, 188–95 (noting among former foster-care children, a high prevalence of homelessness, high rate of criminal activity, lack of educational achievement, difficulty in obtaining and maintaining employment, prevalence of poverty, lack of access to healthcare and mental health services, and lack of basic independent living skills).

The fact that appellant was raised in foster care and suffered from the traumatic consequences associated with it, constitutes critical evidence supporting mitigation of her punishment. There is no reasonable sound trial strategy, regardless of any possible subjective reason of trial counsel, in not bringing such consequential evidence to the trial court's attention during the punishment phase of appellant's adjudication hearing. In response to the trial court's question of whether the defense had "[a]ny evidence on punishment," appellant's counsel literally responded, "No." Thus, the record presented demonstrates that trial counsel's performance, as a matter of law, fell below an objective standard of reasonableness. *See Lopez,* 343 S.W.3d at 143 ("[T]he record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial

strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning."). Further, a reasonable probability exists that the trial court's assessment of punishment would have been much less severe in the absence of counsel's deficient performance. *See Bazan*, 403 S.W.3d at 13. Accordingly, I would sustain appellant's sole issue and reverse and remand this case to the trial court for a new hearing on punishment.

Sadly, in seeking "the higher end" of the punishment range in this case, the State not only made it virtually impossible for appellant to ever overcome her disadvantages related to growing up in Texas' foster care system, but it has also essentially condemned her two children to the same awful fate. This case serves to illustrate the role that the State itself unwittingly plays in creating a cycle of desperation, poverty, and crime for children raised in its inadequately supported foster care system. Traumatized children should not be raised in the fluorescent-lit hallways of state office buildings. And the State that separates children from their parents and places them in foster care should fulfill its duty to provide them with adequate support, counseling, education, and training, both while they are in foster care and after they leave foster care. Until it does so, the vicious cycle will continue.

Jennings, J., dissenting.