**Opinion issued April 30, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00362-CR

———————————

**ALYNN BLAKE CHAPPELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 21CR0167**

---

## MEMORANDUM OPINION

A jury found appellant, Alynn Blake Chappell, guilty of the felony offense of aggravated sexual assault of a child.[1]  After appellant pleaded true to the allegation in an enhancement paragraph that he had been previously convicted of

---

[1]    *See* TEX. PENAL CODE ANN. § 22.021.

an offense under the Uniform Code of Military Justice ("UCMJ"), the jury assessed his punishment at confinement for life. In two issues, appellant contends that his trial counsel provided him with ineffective assistance of counsel and the trial court erred in admitting certain evidence.

We affirm.

## Background

The complainant's mother testified that L.W., the complainant, was her daughter, and at the time of trial, the complainant was eleven years old. The complainant's mother had another daughter, the complainant's sister, who was about a year younger than the complainant. The complainant's mother was married to the complainant's stepfather, and she lived with the complainant's stepfather, her two daughters, and her stepson, the son of the complainant's stepfather. Appellant was the complainant's mother's first cousin. She and appellant were close in age and in the same grade while in school. They "grew up together," went to school together, and "were around each other frequently." The complainant and her sister called appellant "Uncle Algyn" as a nickname.

The complainant's mother further explained that her grandmother, "Mammers," owned a piece of property in Alvin, Galveston County, Texas with multiple houses on it.[2] In August 2020, the complainant's mother and her family

---

[2] The complainant's mother testified to the precise address of the property.

moved into "[t]he bigger house" on the property, which Mammers, Mammers's husband, and appellant had previously lived in.[3] Mammers had offered the complainant's mother a "rent-to-own deal" for the larger home. At the same time, Mammers offered to let appellant move into a second home close to the larger home on the same property, and appellant was to pay $600 a month in rent. Once the complainant's family moved into the larger home, appellant moved into the second home.

Additionally, the complainant's mother testified that in August 2020, the complainant was eight years old and in the third grade. After the complainant's family moved into the larger house, appellant was at their home daily and "very often." Appellant would come over and eat dinner with the complainant's family, and he would use the family's internet and television. The complainant's mother had game nights with her "nursing study group," and appellant would participate. Appellant had a "good relationship" with the complainant's family.

---

[3] The complainant's mother testified that appellant moved in with Mammers after he was discharged from the United States Navy. As to why he left the Navy, appellant told the complainant's mother that he "was in a chat room talking to a girl," who ended up being underage, and although "he ended the chat immediately," he was "released" from the Navy. Appellant told the complainant's mother that the girl was sixteen years old and he only talked to her for a day. According to appellant, "as soon as she revealed her age[,] he ended the chat." The complainant's mother believed appellant. Appellant told other people the same story about his discharge from the Navy.

3

As to appellant's relationship with the complainant and the complainant's sister, the complainant's mother testified that she previously thought his relationship with her daughters was "great." He played games with them and would "chase [them] around and [have] tickle fights." Appellant offered to babysit the complainant and her sister because he was not working, and the complainant's mother allowed him to do so.

The complainant's mother further testified that in December 2020, she went to get a Christmas tree and appellant babysat the complainant, the complainant's sister, and the complainant's stepbrother. Then, a few weeks later, on December 17, 2020, the complainant's mother, the complainant's stepfather, the complainant's sister, and the complainant's stepbrother planned to go get firewood for a bonfire. At the time, the complainant was grounded and was supposed to stay at home to clean her room. The complainant's mother called appellant to see if he could watch the complainant while she cleaned her room. However, when the complainant's mother told the complainant that appellant was "going to come watch [her] while [the family went to] go get the firewood," the complainant began to cry hysterically. (Internal quotations omitted.) The complainant's mother believed that the complainant's tears were genuine. The complainant then said, "Mommy, please no," and "started rambling about, he did this, he's done this, he

4

does this." In response, the complainant's mother called appellant and told him that he did not need to come over.

The complainant then told her mother that appellant had "kisse[d] [her] like grownups do," "touche[d] her butt," and "touche[d] [her] privates." (Internal quotations omitted.) The complainant also said that appellant had "rub[bed] her butt," "touched her pee-pee,"[4] "touched her under her bath towel," "told her to take the towel out of [sic]," and "laid in bed with her and told her that he wishe[d] she could be older to be his girlfriend." Appellant also told the complainant "to keep it a secret." When the complainant's mother asked the complainant for clarification on what she meant by "kiss[ing] [her] like grownups do," the complainant demonstrated what appellant did "around [her] mouth."

The complainant also told her mother that a few weeks earlier, when the complainant's mother had gone to get a Christmas tree, appellant and the complainant were "playing monster," and appellant rubbed the complainant's "butt" under her underwear. The complainant further reported that once, when she was at Mammers's home and appellant was living there,[5] appellant touched her "pee-pee." Appellant told the complainant to sit on his lap and then rubbed her

---

[4] The complainant's mother testified that the complainant meant vagina when she used the word "pee-pee."

[5] This was before the complainant's family moved into the larger home and when Mammers and appellant were still living in the home together.

"pee-pee" under her underwear. According to the complainant's mother, the complainant made additional disclosures later.

The day after the complainant's outcry, the complainant's mother and stepfather went to the complainant's elementary school to speak to the school counselor and the on-campus law enforcement officer. Officers from the Galveston County Sheriff's Office ("GCSO") then came to the school to speak with the complainant's mother, and the complainant, later that day, had a forensic interview at the Advocacy Center for Children of Galveston County ("CAC").

According to the complainant's mother, the complainant's behavior had changed following the sexual abuse by appellant. The complainant now suffered from severe separation anxiety, "to the point of complete and total meltdowns, screaming begging [her mother] not to leave, begging [her stepfather] not to leave." The complainant also had difficulty focusing in school, and her grades had dropped. The complainant previously made As in school, and now, if she was lucky, she got Cs. Everything was overwhelming to the complainant. The complainant attended therapy, which she began in January 2021 after her sexual abuse outcry.

The complainant's mother further testified that she believed the complainant's statements about appellant's sexual abuse. The complainant's mother had asked the complainant if "anybody [other than appellant] ha[d] ever

6

touched her inappropriately or done anything like what she was describing to make her feel uncomfortable," and the complainant said, "[N]o." The complainant also told her mother that her stepfather had never made her feel uncomfortable. The complainant had only ever named appellant as the person who had sexually assaulted her. According to the complainant's mother, appellant had access to the complainant, and he had babysat the complainant. The complainant's mother trusted him before the complainant's sexual abuse outcry.

The complainant's stepfather testified that he had been in a relationship with the complainant's mother for eight years. The complainant and her sister referred to him as "dad," and he had a close relationship with them.

According to the complainant's stepfather, in December 2020, he lived with the complainant's mother, the complainant, the complainant's sister, and his son in a home on a property in Galveston County.[6] The family had moved into the larger home on the property in August 2020 after working out a "rent[-]to[-]own type deal" with Mammers. The complainant's mother and stepfather were responsible for paying about $650 in rent each month to live in the larger home. Appellant lived on the same property in a mobile home and was required to pay $600 in rent to Mammers.

---

[6] The complainant's stepfather identified the home's address at trial.

The complainant's stepfather further testified that in December 2020, the complainant had "an outburst" regarding appellant. The complainant "made some statements" about appellant, and she was visibly upset, crying, and "very emotional" at the time. The complainant had never changed "her outcry regarding [appellant]."

The complainant testified that, at the time of trial, she was eleven years old and in the sixth grade. She lived with her mother, her stepfather, her younger sister, and her stepbrother. Previously, the complainant lived in the larger home owned by Mammers, the complainant's great-grandmother. Before the complainant's family moved into the larger home, Mammers and appellant—the complainant's relative—lived in the home.

The complainant further testified that on a day in December 2020, appellant was supposed to "watch [her] alone," while the rest of her family was away. When the complainant learned of this, she started crying and told her mother that she "didn't want [appellant] to watch [her] ever again." The complainant did not want appellant to babysit her because she was "scared something else would . . . happen[]."

The complainant then told her mother that appellant had "sexually assaulted [her] by putting his finger inside of [her] vagina." This had occurred in a bedroom at the larger home before the complainant's family moved into the home and when

8

appellant was still living there. The complainant explained that appellant was "sitting in a chair next to the door and [she] sat on his lap and there was a blanket on top of [her] and [appellant]." Appellant then stuck his hand under her clothes and underwear and "put[] his finger inside of [her] vagina." It hurt so the complainant stood up. The complainant ran into the bathroom to dry her face so that no one could see that she was crying.

The complainant also testified that there was another time, after her family moved into the larger home, when she was grounded and had to clean her room. Appellant came over to her house to babysit her and her siblings. Appellant came into the complainant's bedroom to watch her clean and "told [her] to go lay down with him" on her bed. After the complainant complied, appellant "put his finger inside of [her] vagina again." Appellant told the complainant to "keep [it] a secret." Appellant also told the complainant that "he wishe[d] [she] was a little older so [she] could be his girlfriend."

As to other incidents involving appellant that made her feel uncomfortable, the complainant explained that there were times when appellant would "rub" her bottom inside of her clothes and underwear. This made her feel scared. The complainant also testified that there was one time that she, her sister, and appellant were playing a game and appellant "pulled down [the complainant's] sister's

9

underwear and pants" and said that the complainant's sister "was mooning [them]."

Further, according to the complainant, appellant had taken photographs of the complainant and her sister on his cellular telephone while they were taking a shower, even though the complainant and her sister "duck[ed] down" in the shower to avoid having their picture taken and told appellant to "[s]top taking pictures" of them. The complainant knew it was appellant taking the photographs because she heard his voice and saw his face. Appellant stood on the toilet in the bathroom to take photographs above the shower curtain. The complainant also noted that appellant had kissed her and her sister inappropriately at times, like "[h]ow adults would in movies."

The complainant eventually told her mother what had happened with appellant, but she did not make her disclosure immediately after the incidents because she did not feel safe doing so. According to the complainant, appellant only did things to her if her parents were not around, or if they were around, "he would go take [her] and hide somewhere and do it to [her]." After the complainant made her disclosure to her mother, the complainant's family had to move out of the larger home on Mammers's property.

The complainant's sister testified that, at the time of trial, she was ten years old and in the fourth grade. She was six years old the last time that she saw

10

appellant in person. She was previously interviewed at the CAC "[b]ecause of what [appellant] did to [her] and [her] sister."

The complainant's sister testified that, when she was six years old, appellant took photographs of her and the complainant when they were naked in the shower. She knew it was appellant taking the photographs of them because she saw his face and his cellular telephone. The complainant's sister did not ask appellant to take photographs of her or the complainant. The complainant and her sister "duck[ed] down so [appellant] couldn't see" them to take their picture, and they told appellant to "stop" and "get out." Appellant responded that "it was okay" because "he used to change [their] diapers." Appellant was not supposed to be in the bathroom when the complainant's sister and the complainant were showering, and the complainant's sister felt uncomfortable because of appellant's actions.

Former Santa Fe Independent School District Police Department Officer E. Moore testified that in December 2020, she worked at an elementary school "keep[ing] the kids safe" and "work[ing] any incidents that happened at the school." Parents with children at the school would sometimes report other crimes to Moore directly instead of calling for emergency assistance. On December 18, 2020, the mother of the complainant, a student at the school, made a report about a crime that had not occurred at the school. Accordingly, Moore determined where the offense had occurred and called the GCSO. An officer responded to the call.

11

GCSO Detective M. Remmert testified that he was dispatched to an elementary school on December 18, 2020, where he spoke to the complainant's mother and stepfather. The complainant was taken to the CAC for a forensic interview, and in the interview, the complainant identified appellant as the person who had inappropriately touched her. The complainant also identified the location in Galveston County where the incidents with appellant had occurred, with the most recent incident occurring about three weeks before December 18, 2020.

Detective Remmert further testified that, as part of his investigation, he interviewed appellant,[7] appellant's aunt, the complainant's mother, and the complainant's sister. And based on his investigation, he believed that appellant had committed the offense of aggravated sexual assault of a child against the complainant.

Kim Keever, a forensic interviewer at the CAC, testified that she interviewed the complainant on December 18, 2020. The complainant was eight years old at the time. Keever did not see any "red flags" during the complainant's interview. A videotaped recording of the complainant's interview was admitted into evidence at appellant's request.

---

[7] A videotaped recording of appellant's interview was admitted into evidence at trial. Detective Remmert testified that based on appellant's demeanor during his interview, Remmert felt that appellant was lying or being deceptive.

12

Jadin Bright testified that she was the complainant's first cousin and appellant's second cousin. Appellant was nine years older than her. Bright had not interacted with appellant since she was fourteen years old.[8] Bright explained that when she was fourteen years old, appellant messaged her on Facebook Messenger,[9] stating, "Hi, do you remember what we used to do when you were little[?]" (Internal quotations omitted.) Bright stated that appellant was referring to something that happened to her when she was five years old.

According to Bright, when she was five years old, she lived with her father and Mammers at Mammers's home on her property. Appellant lived in another house on the same property. There was a time when Bright was at appellant's home, and appellant took her inside to play hide-and-seek; they hid in a closet. Appellant told her that they "had to be quiet because [they] would get caught and [they] would be found," so Bright stayed quiet. Appellant then "pulled out his penis" and told Bright, "Just kiss it; just kiss it." When Bright said, "No," appellant said, "Just touch it." Bright said, "No," and appellant told her, "Well, touch it or I'm going to tell your dad." Bright "didn't want to get in trouble so [she] touched [appellant's] penis." Appellant then asked Bright if she "like[d]

---

[8]  Bright stated that she was twenty-three years old at the time of trial.

[9]  *See Edwards v. State*, 497 S.W.3d 147, 155 n.8 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Facebook Messenger is a mobile tool that allows users to instantly send chat messages to friends on Facebook." (internal quotations omitted)).

that," and when Bright said, "No," appellant told her to "give him a kiss." Bright explained that it was normal in her family to kiss older family members on the cheek, so she "went to give him a kiss on the cheek." Appellant then "turned his head and kissed [her] on the lips and asked [her] if [she] liked that." Bright again said, "No." Appellant continued to have his penis out and was holding it for the rest of the time that they were hiding in the closet.

Bright noted that she did not tell anyone about the closet incident until she received the message from appellant when she was fourteen years old. She then told her mother and showed her the messages from appellant. In addition to the message referring to the closet incident, appellant sent Bright a photograph of himself in his Navy uniform. He told Bright that "he was in the Navy and that he was engaged but that he would leave his fianc[é] for [her]." When Bright did not respond to appellant, appellant sent her a photograph of his erect penis while he was sitting on the toilet. Bright's mother told her to delete the messages and "block" appellant so that he could not message her, and Bright complied.

Former Air Force Office of Special Investigations Special Agent A. Agrelius testified that in 2015, he was a member of the Internet Crimes Against Children Task Force and stationed at Robins Air Force Base in Georgia. At the time, he participated in an "undercover chat operation," and his persona was "Lisa," "a 13-year-old girl who lived on Robins Air Force Base." He posted as "Lisa" on

14

"Meet24," a website,[10] that Lisa was "home for the summer visiting [her] dad on the base, looking for friends." In response to the post on "Meet24," appellant, who was stationed at a Navy base in Gulfport, Mississippi, initiated contact with Agrelius, stating: "I have a military ID card; I have a truck; hey, gorgeous." Appellant's face was his profile picture, and he sent Agrelius a photograph of himself in a construction hat with his last name printed on it.

Special Agent Agrelius further testified that appellant stated he was twenty-four years old at the time, and Agrelius, as "Lisa," told appellant that she was thirteen years old. Appellant responded that he was "very much okay with 13 [year olds] and that he kn[ew] it[] [was] wrong but he like[d] girls very young." According to Agrelius, he told appellant multiple times that "Lisa" was thirteen years old during their conversations, but even so, appellant's conversations with "Lisa" "went into the sexual realm"[11] and lasted for months. Twice, appellant

---

[10]　*See United States v. Meier*, No. ACM 39759, 2020 WL 7391567, at *2 (A.F. Ct. Crim. App. Dec. 15, 2020) (explaining "Meet24" was "a social media application . . . that allow[ed] subscribers to exchange messages" (internal quotations omitted)); *see also United States v. Perez*, No. 19 Cr. 297 (PAE), 2024 WL 244380, at *1 (S.D.N.Y. Jan. 23, 2024) (op. and order) ("Meet24" was "a cellphone-based dating app . . . known by the FBI to be used by child sex offenders").

[11]　Special Agent Agrelius testified as to the contents of some of appellant's messages to "Lisa," in which appellant said: "Very much okay with 13. I know it's bad for me, but I can't help it. I like girls young." Appellant also asked "Lisa": "Have you ever had a finger inside you?" And he asked her if she was "okay with him getting her pregnant" and "where d[id] [she] want [him] to cum when [he] ma[de] love to [her]?" Appellant further told "Lisa":

talked about coming to meet "Lisa." Although a visit was set up for appellant to come to Robins Air Force Base to meet "Lisa," that did not occur.

Special Agent Agrelius also explained that appellant had sent "Lisa" photographs of "his exposed, erect penis, generally taken from sitting on the toilet so the view of the camera [was] pointing down so you [could] see his exposed genitalia, the top of his thighs and the toilet itself along with the floor." In one of the photographs, Agrelius could see that appellant was wearing "his Navy fatigues, the green and black camouflage." Agrelius noted that he, as "Lisa," never asked appellant for such photographs, did not encourage appellant to send such photographs, and did not send appellant naked photographs of "Lisa."[12] Appellant asked "Lisa" for naked photographs on several occasions, as well as photographs of her in a bra and underwear or in a bikini swimsuit. In his conversations with appellant, Agrelius did not act like "Lisa" was a "sexually active individual."

---

> I want you to say fuck me daddy while I make love to you. Even if all I get is one day with you where your parents won't ask where you are or who you're with, I'm fine. I want to fuck you baby. I want to lick your pussy as I suck my cock and then slide it deep in your pussy and make live [sic] to you, genital [sic] at first. And then I want to be a little more rough.

Additionally, appellant asked "Lisa": "[D]o you want me to put my cock anywhere else besides your pussy[?]" And he suggested, "Mouth and ass."

[12] Special Agent Agrelius noted that he did not respond to appellant's sexual messages with anything other than "an emoji or a shocked face"; he did not engage in sexual discussions with appellant as "Lisa."

16

According to Special Agent Agrelius, appellant had conversations with him through "Meet24" during the day. Appellant also asked if "Lisa" "could download an application that would be more secure [for] texting and phone calls, that wouldn't show up on a phone bill." Appellant was "worried about Lisa's father finding out or [her] parents finding out."[13]

Special Agent Agrelius explained that he ultimately referred his investigation involving appellant to the Naval Criminal Investigative Service, which conducted felony level investigations, because appellant was stationed at a Naval base and the Navy had jurisdiction "over all sailors." According to Agrelius, in his conversations with "Lisa," appellant had engaged in "grooming behavior." At trial, Agrelius read a statement from the report by the Naval Criminal Investigative Service which stated that appellant had "admitted he knew it was wrong to send photographs of his penis and have sexually explicit communications to Lisa. And [he] stated he couldn't stop because he wanted the attention."

The trial court admitted into evidence a copy of a United States of America Department of the Navy conviction related to appellant's actions with "Lisa." Appellant pleaded guilty to violating Article 80 of the Uniform Code of Military

---

[13]     According to Special Agent Agrelius, appellant asked "Lisa": "You promise not to tell no one or say I'm raping you."

Justice.[14]   Specifically, appellant pleaded guilty to and the general court-martial found appellant guilty of:

- On or between 1 September 2015 and 31 December 2015, at or near Gulfport, Mississippi, [appellant] attempt[ed] to commit a lewd act upon "Lisa[,]"[] a child who had not attained the age of 16 years, by intentionally communicating to her indecent language, to wit: "u want me to fuck you really hard baby? Want me to force it in ur mouth and pussy," or words to that effect, with an intent to gratify [appellant's] sexual desires.

- On or between 1 September 2015 and 31 December 2015, at or near Gulfport, Mississippi, [appellant] attempt[ed] to commit a lewd act upon "Lisa," a child who had not attained the age of 16 years, by intentionally communicating to her indecent language, to wit: "cuz I badly wanna take ur virginity and keep going. I wanna fuck you for hours and hours," or words to that effect, with an intent to gratify [appellant's] sexual desires.

- On or between 1 September 2015 and 31 December 2015, at or near Gulfport, Mississippi, [appellant] attempt[ed] to commit a lewd act upon "Lisa," a child who had not attained the age of 16 years, by intentionally communicating to her indecent language, to wit: "I kno baby girl and u will and ur gonna get my cum all over u as I slide my cock in all your tight wet holes," or words to that effect, with an intent to gratify [appellant's] sexual desires.

- On or between 1 September 2015 and 31 December 2015, at or near Gulfport, Mississippi, [appellant] attempt[ed] to commit a lewd act upon "Lisa," a child who had not attained the age of 16 years, by engaging in indecent conduct, to wit: transmitting digital images of a naked erect penis to her, intentionally done, which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

---

[14]    *See* 10 U.S.C. § 880.

Appellant was sentenced to confinement for thirty months, a reduction of pay grade, and a "discharge[] from the naval service with a bad-conduct discharge." Appellant's conviction and sentence were affirmed by the United States Navy-Marine Corps Court of Criminal Appeals.

**Ineffective Assistance**

In his first issue, appellant argues that his trial counsel did not provide him with effective assistance of counsel because trial counsel did not "object[] during [the guilt phase of trial] to the [State] eliciting testimony from multiple witnesses who testified that they believed the complainant was telling the truth."

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also* TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05; *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (test for ineffective assistance of counsel same under both federal and state constitutions). To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App.

2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

Appellant has the burden to establish both prongs of the *Strickland* test by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "[A]ppellant's failure to satisfy one prong . . . negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697.

Although appellant filed a motion for new trial, he did not raise his ineffective-assistance-of-counsel complaint in his motion, and he did not obtain an affidavit from his trial counsel or afford his counsel an opportunity to explain his trial decisions or his strategy. A trial record alone is rarely sufficient to show ineffective assistance of counsel. *Williams v. State*, 526 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). And generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392

20

(Tex. Crim. App. 2005); *see also Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007) (noting "presumption that trial counsel's performance was reasonably based in sound trial strategy"). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But the record must demonstrate that trial counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*; *see also Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (when trial counsel is not given opportunity to explain his actions, "the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it" (internal quotations omitted)).

Appellant argues that his trial counsel's performance fell below an objective standard of reasonableness because counsel failed to object to certain "inadmissible testimony" from various witnesses.

First, appellant complains that his counsel did not object to the following testimony by the complainant's mother:

Q.   All right. Let me ask you, do you believe your daughter?

A.   I do.

. . . .

Q. And at that time did it seem like [appellant's brother] had -- I guess, how would you describe his relationship?

A. [Appellant's brother] initially seemed surprised. He stated he didn't want to believe that that is what happened but that he didn't think [the complainant] would lie about something like that.

Q. Okay. And where was he living at the time?

A. With [appellant].

Q. Was he in the fire academy at the time?

A. I believe so, yes, ma'am.

Q. Do you believe that your daughter[, the complainant,] is telling the truth about her Uncle Algyn, also known as [appellant] in this case?

Appellant's counsel objected before the complainant's mother responded to the last question by the State, and the trial court sustained the objection. Thus, the complainant's mother did not answer the State's last question.[15]

---

15 As to appellant's complaint about his counsel's failure to object to the State's question, "[d]o you believe that your daughter[, the complainant,] is telling the truth about her Uncle Algyn, also known as [appellant] in this case," we note that appellant's trial counsel did object to that question and the trial court sustained trial counsel's objection. Thus, appellant cannot now assert on appeal that his counsel was ineffective for failing to object to the State's question, when his counsel did, in fact, object to the question and the complainant's mother did not answer it. *See, e.g., Spillman v. State*, No. 02-16-00283-CR, 2017 WL 5180777, at *6 (Tex. App.—Fort Worth Nov. 9, 2017, no pet.) (mem. op., not designated for publication) (appellant could not prevail on complaint trial counsel did not make specific objection where trial court sustained trial counsel's general objection and instructed jury to disregard testimony); *Kennedy v. State*, No. 5-96-01988-CR,

Second, appellant complains that his trial counsel did not object to the following testimony by Keever, who conducted the complainant's forensic interview at the CAC:

Q. All right. Were there any red flags that you saw?

A. No.

Q. Was she descriptive in describing what was happening with her body language as well?

A. Yes.

Q. And I'm showing you on the screen State's Exhibit 47. Does she appear to be making eye contact?

A. Yes.

Q. Did she have decent eye contact?

A. Yes.

Third, appellant complains that his counsel did not object to certain testimony by Detective Remmert, in which Remmert stated:

Q. After conducting the interviews, watching the CAC forensic interview, do you have an opinion as to whether or not [appellant] committed the offense of aggravated sexual assault of a child?

A. I do.

Q. And what is that opinion?

---

1998 WL 839602, at *5 (Tex. App.—Dallas Dec. 7, 1998, no pet.) (not designated for publication) ("[A]ppellant cannot show that counsel was ineffective because [counsel's] objection was sustained . . . .").

23

A. I believe that he did.

Finally, appellant complains that the State elicited the following testimony from appellant's brother on cross-examination:[16]

Q. Do you think that [the complainant] would lie about something so important like this?

A. I'm not sure what she would do.

Q. Did you tell [the complainant's mother] back when it first happened that you don't think that [the complainant] would lie about something like this?

A. Can you repeat the question?

Q. Do you recall telling [the complainant's mother] that you don't think that [the complainant] would lie about something like this?

A. No, I don't recall that.

Judicial scrutiny of trial counsel's performance is highly deferential. *Mata*, 226 S.W.3d at 428. Even if trial counsel's performance seems questionable in hindsight, that is not enough. *See Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2007). An appellate court may not infer ineffective assistance of counsel merely from an unclear record or a record that does not show why counsel failed to do something. *See Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432; *Ross*

---

[16]  Appellant's brother testified as a witness for the defense.

*v. State*, No. 02-22-00160-CR, 2023 WL 4243479, at *2 (Tex. App.—Fort Worth June 29, 2023, pet. ref'd) (mem. op., not designated for publication).

Here, the record does not contain any evidence of trial counsel's strategy, and as such, we must presume that counsel's performance was effective. *See Lopez*, 343 S.W.3d at 142–43; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (when record contains no evidence to show reasons for trial counsel's allegedly ineffective acts or omissions, it cannot be concluded counsel performed deficiently); *see also Goodspeed*, 187 S.W.3d at 392 (in case where record silent as to trial counsel's reasoning, appellate court should find ineffective assistance only if challenged conduct so outrageous that no competent attorney would have engaged in it); *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.) ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy."). Further, we cannot speculate about why counsel acted as he did. *Davis v. State*, 930 S.W.2d 765, 769 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd); *see also McCook v. State*, 402 S.W.3d 47, 51 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("[I]n order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record and the court must not engage in retrospective speculation."). This is because when "counsel's reasons for his conduct do not appear in the record and there is at least

the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions." *Johnson v. State*, 432 S.W.3d 552, 555 (Tex. App.—Texarkana 2014, pet. ref'd).

Here, it is possible that appellant's trial counsel did not object to the complained-of testimony[17] because he did not want to call attention to the testimony or because he believed that the witnesses were coming across as biased and it would not have been beneficial to object. *See, e.g.*, *Weatherly v. State*, 283 S.W.3d 481, 487–88 (Tex. App.—Beaumont 2009, pet. ref'd). Further, we cannot say that trial counsel's conduct was so outrageous that no competent attorney would have engaged in it. *See Menefield*, 363 S.W.3d at 593; *see also Garivaldi v. State*, No. 14-22-00093-CR, 2023 WL 2585913, at *3 (Tex. App.—Houston [14th Dist.] Mar. 21, 2023, no pet.) (mem. op., not designated for publication) (explaining "[t]he[] failures to object to potentially inadmissible testimony are not sufficient, in themselves, to constitute deficient performance" and "[p]lausible professional reasons exist for not objecting," even to inadmissible testimony).

Based on the foregoing, we hold that appellant has not established that his trial counsel's performance fell below an objective standard of reasonableness.

---

[17] We do not express an opinion on whether the testimony of the complainant's mother, Keever, Detective Remmert, or appellant's brother, about which appellant complains on appeal, constituted inadmissible evidence. *See* TEX. R. APP. P. 47.1; *see generally Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002) (to establish ineffective assistance of counsel for failing to object to evidence, defendant must establish that evidence was inadmissible).

Additionally, we note that in order to prevail on his ineffective-assistance-of-counsel claim, appellant is required to show on appeal that (1) his trial counsel's performance fell below an objective standard of reasonableness *and* (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez*, 343 S.W.3d at 142. However, other than setting forth the appropriate standard in his briefing, appellant's brief wholly fails to address the prejudice prong of the ineffective-assistance-of-counsel test. *See* TEX. R. APP. P. 38.1(i) (appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities"); *see, e.g.*, *Barrera v. State*, No. 05-23-01105-CR, 2025 WL 905802, at *2 (Tex. App.—Dallas Mar. 25, 2025, pet. ref'd) (mem. op., not designated for publication); *Johnson v. State*, No. 01-23-00247-CR, 2023 WL 7391875, at *6 (Tex. App.—Houston [1st Dist.] Nov. 9, 2023, no pet.) (mem. op., not designated for publication) (holding appellant waived her ineffective-assistance-of-counsel complaint where her brief "contain[ed] no argument, substantive analysis, or citation to authorities to show that the result of the proceeding would have been different but for her trial counsel's purported error"); *Crow v. State*, No. 01-21-00725-CR, 2023 WL 5761129, at *12 (Tex. App.—Houston [1st Dist.] Sept. 7, 2023, pet. ref'd) (mem. op., not designated for publication) (same).

As such, even if appellant could establish on direct appeal that his trial counsel's performance was deficient in failing to object to the complained-of testimony, we would necessarily conclude that appellant had waived his ineffective-assistance-of-counsel complaint due to inadequate briefing of the second prong of the ineffective-assistance-of-counsel test. *See Armendariz v. State*, No. 11-18-00361-CR, 2021 WL 2470337, at *4 (Tex. App.—Eastland June 17, 2021, pet. ref'd) (mem. op., not designated for publication) ("The failure to brief both prongs [of the *Strickland* test] has been deemed to be a waiver of a claim for ineffective assistance of counsel."); *Bessey v. State*, 199 S.W.3d 546, 555 (Tex. App.—Texarkana 2006) (holding ineffective-assistance-of-counsel complaint inadequately briefed where appellant made "no effort to demonstrate how the record demonstrate[d] prejudice"), *aff'd*, 239 S.W.3d 809 (Tex. Crim. App. 2007); *see also Ramirez v. State*, No. 13-20-00186-CR, 2022 WL 480245, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 17, 2022, no pet.) (mem. op., not designated for publication) (appellant's complaint that trial counsel was ineffective for failing to object to certain testimony was inadequately briefed where appellant made no argument that "there [was] a reasonable probability that, but for counsel's alleged error of failing to object, the result would have been different").

We overrule appellant's first issue.

**Admission of Evidence**

In his second issue, appellant argues that the trial court erred in admitting into evidence "testimony and records"[18] about appellant's "prior military conviction" during the guilt and punishment phases of trial because "[i]t was fundamentally unfair and prejudicial to [a]ppellant that the State was allowed to use a conviction to elevate his punishment and use[] that same conviction during [the guilt phase] to convict him."

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). A

---

[18] In raising his second issue in his briefing, appellant does not specify the particular "testimony and records" of his "prior military conviction" about which he complains. However, because appellant, in a single sentence in his argument section of his brief, refers to Special Agent Agrelius's testimony "of the specific allegations concerning [a]ppellant's previous military conviction," we will presume, for purposes of this opinion, that appellant's complaint about the trial court's admission of testimony about his "prior military conviction" is a complaint about the admission of Agrelius's testimony on the subject. Further, because appellant's brief does not specify, or direct the Court, to the particular "records" about which he complains in his second issue, we hold that any complaint about the trial court's admission of "records" is waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *Chaves v. State*, 630 S.W.3d 541, 555 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("An appellant waives a[] [complaint] on appeal if he does not adequately brief that [complaint] by not providing supporting arguments, substantive analysis, and *appropriate* citations to authorities and to the record."); *Ahmad v. State*, 615 S.W.3d 496, 502 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (appellate court need not "scour the records" to support appellant's assertion of error); *see also Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) ("[A]n appellate court has no obligation to construct and compose . . . appellant's issues, facts, and arguments with appropriate citations to authorities and to the record." (internal quotations omitted)). Thus, we will only consider whether the trial court erred in admitting Agrelius's testimony when addressing appellant's second issue.

trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court's decision to admit evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).

To preserve a complaint for appellate review, a defendant must show that he made his complaint to the trial court by a timely and specific request, objection, or motion, and the trial court either ruled on his request, objection, or motion, or refused to rule, and he objected to that refusal. TEX. R. APP. P. 33.1(a); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007). The rationale of rule 33.1 is that if an objection is raised before the trial court as soon as error becomes foreseeable, the error may be addressed and possibly corrected or avoided. *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009). Almost all error must be preserved by objection, or it is waived. *See Hull v. State*, 67 S.W.3d 215, 216–18 (Tex. Crim. App. 2002); *Holland v. State*, 802 S.W.2d 696, 700–01 (Tex. Crim. App. 1991); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990).

A defendant also fails to preserve error when the contention urged on appeal does not match the specific complaint made in the trial court. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). In other words, an objection stating

one legal basis may not be used to support a different legal theory on appeal. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004).

On appeal, appellant complains that the trial court erred in admitting Special Agent Agrelius's testimony about appellant's "prior military conviction" because it was improper to admit such evidence in *both* phases of trial. This was not an argument raised by appellant in the trial court. Because appellant did not object to the admission of Agrelius's testimony on the basis that it was improper to admit such evidence during *both* phases of trial, we hold that appellant has not preserved his second issue for appellate review. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) ("An objection stating one legal theory may not be used to support a different legal theory on appeal." (internal quotations omitted)); *Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) ("Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review.").

## Conclusion

We affirm the judgment of the trial court.

Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).